**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| OTAY MESA PROPERTY L.P., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 06-167L<br>(and consolidated cases)<br><br>Hon. Thomas C. Wheeler |

**JOINT STIPULATIONS OF FACT**

In accordance with this Court's Fourth Amended Pretrial Order of July 22, 2008, Plaintiffs and Defendant jointly stipulate that the following facts are true, and need not be established by any further proof at trial:

**Subject Parcels**

1. The property at issue in this litigation consists of 11 parcels located in the Otay Mesa area of San Diego County, CA. The parties have numbered the parcels as Parcels 1-11, as shown on the Property Map, Exhibit JX-1 (DOJ 416376).

2. Parcel 1 (APN 648-080-19, consisting of 74.55 acres) was acquired by Plaintiff, Otay Mesa Property, LP, by deed recorded May 31, 2001 from National Enterprises, Inc., which acquired the property on December 22, 1997. Parcel 1 is subject to three utility easements totaling a width of 290 feet, and which cross the parcel in a southeast to northwest direction.

3. Parcel 2 (part of APN 648-090-04, consisting of 120 acres) was acquired by 3250 Corporation by deed recorded October 19, 1982 from Milton Fredman, Trustee for V&V Development, Co. 3250 Corporation changed its name to Rancho Vista Del Mar on August 21, 1987. Parcel 2 has several outstanding easements including a Mitigation Credit, dated March 8, 2002, in favor of Otay Hills, LLC. Parcel 2 was at all relevant times owned by Plaintiff, Rancho Vista Del Mar.

4. Parcel 3 (part of APN 648-090-04, consisting of 393.6 acres) was acquired by 3250 Corporation by deed recorded October 19, 1982 as part of the same deed transaction as Parcel 2, above. 3250 Corporation changed its name to Rancho Vista Del Mar on August 21, 1987. Parcel 3 was owned at all dates relevant by Plaintiff Rancho Vista Del Mar.

5. Parcel 4 (APN 648-080-10, 21, and 22, 648-090-01, consisting of 160 acres) was acquired by Plaintiff, Otay International, LLC, by deed recorded December 3, 2003 from American International Enterprises, Inc., which acquired Parcel 4 by document recorded August 29, 2003 from Energy Factors, Inc.

6. Parcel 5 (APN 648-080-08, 16, 17, and 18, consisting of 120 acres) was acquired by 3250 Corporation by deed recorded October 19, 1982 as part of the same deed transaction as Parcel 2, above. 3250 Corporation changed its name to Rancho Vista Del Mar on August 21, 1987. Parcel 5 was at all relevant times owned by Plaintiff Rancho Vista Del Mar.

7. Parcel 6 (APN 648-040-35, 36, 37 and 38, consisting of 79.58 acres) was

acquired by OMC Properties, LLC, by deed recorded January 7, 2004 from Otay Mesa Property, LP.

8. Parcel 7 (APN 648-040-23, consisting of 6.34 acres) was acquired by 3250 Corporation on October 19, 1982 as part of the same deed transaction as Parcel 2, above. 3250 Corporation changed its name to Rancho Vista Del Mar on August 21, 1987. Parcel 7 was at all relevant times owned by Plaintiff Rancho Vista Del Mar.

9. Parcel 8 (APN 648-040-17, consisting of 5.00 acres) was acquired by 3250 Corporation on October 19, 1982 as part of the same deed transaction as Parcel 2, above. 3250 Corporation changed its name to Rancho Vista Del Mar on August 21, 1987. Parcel 8 was at all relevant times owned by Rancho Vista Del Mar.

10. Parcel 9 (APN 648-040-15, 31, and 34, consisting of 51.47 acres) was acquired by Rancho Vista Del Mar (formerly 3250 Corporation) in two separate transactions. The first was on October 19, 1982, as part of the same deed transaction as Parcel 2, above. The second was on March 13, 2002, from KYDDLF & RDLF, LLC. An easement over portions of Parcel 9 for purpose of a helicopter-training site and for a fire access road and fuel break were acquired by the United States on November 9, 1990. Various utility easements have also been granted across Parcel 9.

11. Parcel 10 (APN 648-040-39, 40, 41, and 42, 648-080-13, 14, 25, and 26, consisting of 134.89 acres) was acquired by Plaintiff, D&D Landholdings, LP,

by a document recorded December 18, 2000 from Rancho Vista Del Mar. Parcel 10 was owned at all dates relevant by Plaintiff D&D Landholdings, LP.

12. Parcel 11 (APN 648-040-27, 648-040-28, consisting of 95.47 acres) was acquired by 275 Corporation by deed recorded June 27, 1983. On August 21, 1987, 275 Corporation changed its name to Rancho De La Fuente. On September 14, 1992, Rancho De La Fuente changed its name to International Industrial Park, Inc. Parcel 11 was owned at all relevant times by Plaintiff International Industrial Park, Inc.

13. Parcels 1-11 are managed by SD Commercial, LLC, owned by David Wick and by three trusts in the names of Mr. De La Fuentes three oldest children. The names of the trusts are as follows: Ricardo G. De La Fuente Yazdani, 1995 Irrevocable Trust, Roque De La Fuente III, 1995 Irrevocable Trust, Katayoun De La Fuente Yazdani, 1995 Irrevocable Trust.

14. Some of the parcels were in the process of being developed prior to the filing of this litigation.

15. Some of the parcels were in the process of being developed during the pendency of this litigation.

16. Some of the parcels are currently in the process of being developed.

17. The Plaintiffs have leased many of the parcels at issue at various points in the past and/or have granted numerous easements for various purposes over portions of the parcels.

**Construction of the Primary Fence**

18. In the 1980s, the border between Mexico and the United States in the area of the subject parcels was unfenced, poorly marked, and presented no real barrier to entry.

19. In 1990, the Border Patrol, with the assistance of the National Guard, began erecting a physical barrier, now known as the "Primary Fence," along the border between the United States and Mexico.

20. The Primary Fence began at the Pacific Ocean and continued eastward for approximately 14 miles.

21. The Primary Fence is constructed of used surplus welded steel landing mats and is approximately 8-10 feet tall.

22. The Primary Fence terminates at the edge of a hillside just short of the eastern-most boundary of Parcel 3.

23. The Primary Fence was completed in March 1993.

24. A January 1993 report states that one of the goals of constructing the Primary Fence was "to force the traffic back to the open terrain of Otay Mesa where cover is relatively sparse so that sensors and night vision can be used much more effectively and pursuit is much easier and more effective."

25. After construction of the Primary Fence, the number of drive-throughs was dramatically reduced. The Primary Fence was also successful in reducing crime in United States neighborhoods in close proximity to the border. However, even after construction of the Primary Fence, illegal entries still occurred.

**Operation Gatekeeper**

26. In October 1994, the Border Patrol announced "Operation Gatekeeper" which involved large increases in the number of agents, as well as a focus on the stationing of agents directly along the border.

27. Operation Gatekeeper also involved an increase in patrol equipment such as additional night vision goggles and seismic sensors.

28. There was also a significant increase in the number of Border Patrol agents, and in the placement of those agents in the direct vicinity of the border.

29. Under Operation Gatekeeper, the Border Patrol worked to achieve the "goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing USBP with a tactical advantage over illegal border crossers and smugglers."

30. The goal with construction of the Primary Fence in 1990-1993, as well as the intensified enforcement efforts of Operation Gatekeeper in 1994, was to direct illegal entry traffic to the east away from the population centers of San Diego and Tijuana.

**Construction of the Secondary Fence**

31. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorized the construction of a second fence, constructed of high tech steel mesh, near San Diego, 20-22 feet high.

32. The construction of the new fence also included the construction of two roads, one on each side of the new fence, as well as the erection of poles containing

surveillance cameras and permanent security lighting, all constructed on property owned by the United States.

33. In order to expedite construction of the Secondary Fence, the agency was authorized to waive all requirements imposed by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

34. Construction of the Secondary Fence began in 1996, but was halted in February 2004 due to concerns raised by the California Coastal Commission.

35. In 2005, Congress passed the REAL ID Act, Pub. L. 109-13, which gave DHS the power to waive all legal requirements, including those of the California Coastal Commission.

36. At present, approximately 9 out of the planned 14 miles of Secondary Fence have been constructed.

37. At present, the eastern-most portion of the Secondary Fence, which was completed in 2001, ends near the western-most boundary of Parcel 1.

**The Border Patrol Activities on the Subject Property**

38. In performing their duties, Border Patrol agents drive all-terrain vehicles and sports utility vehicles on and off roads on the subject parcels, possibly in plain view of potential customers.

39. Within the past five years, the Border Patrol has brought grading equipment onto the subject property to grade and maintain roads.

40. In performing their duties, Border Patrol agents also use portable spotlights, powered by portable generators. These spotlights are mounted on trailers and transported to where needed.

41. Border Patrol officials have told Plaintiffs that the last mile of the Secondary Fence would soon be completed. The United States has not conducted an appraisal of the land that is needed to construct the fencing adjacent to Parcel 3.

**The Border Patrol**

42. Congress established the United States Border Patrol in 1924.

43. Prior to 2003, the Border Patrol was organized under the Immigration and Naturalization Service.

44. As part of a reorganization that created the Department of Homeland Security in March 2003, the Border Patrol was reorganized as an office under the Bureau of Customs and Border Protection.

45. Border Patrol operations are divided into Sectors; relevant to the property at issue in this case ("subject property") is the San Diego Sector Office of the Border Patrol.

46. The San Diego Sector Office has responsibility over a number of Border Patrol Stations, including the Chula Vista Station and the Brown Field Station.

47. The territory within the enforcement responsibility of the San Diego Sector is administratively divided into enforcement zones, and each zone is assigned to a particular station. The zones assigned to a particular station sometimes change over time in response to the level of illegal alien traffic and the availability of

manpower, infrastructure, and technology.

Respectfully submitted,

s/ Roger Marzulla
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA LAW
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Counsel for Plaintiffs

s/ Susan Cook
Susan V. Cook
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044
(202) 305-0470 (telephone)
(202) 305-0506 (facsimile)

Dated: August 29, 2008

Counsel of Record for Defendant