# In the United States Court of Federal Claims

No. 06-167L (and consolidated cases)

(Filed: May 5, 2009)

```
*********************************** *
                                    *
OTAY MESA PROPERTY L.P. et al.,     *
                                    *   Fifth Amendment Takings Claim;
                Plaintiffs,         *   Border Patrol's Activities on
                                    *   Plaintiffs' Property Near
v.                                  *   Mexican Border; Statute of
                                    *   Limitations; Partial Liability for
THE UNITED STATES,                  *   Use of Motion-Detecting
                                    *   Sensors.
                Defendant.          *
                                    *
*********************************** *
```

*Roger J. Marzulla*, Marzulla Law, Washington, D.C., with whom were *Nancie G. Marzulla* and *Lucy J. Wiggins*, for Plaintiffs.

*Susan V. Cook*, with whom was *John C. Cruden,* Acting Assistant Attorney General, United States Department of Justice, Natural Resources Section, Environment & Natural Resources Division, Washington, D.C., *Lary C. Larson*, Trial Attorney, and *Melissa Erny* and *A. Ted Kundrat*, United States Customs and Border Protection, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

In this Fifth Amendment takings case, Plaintiffs seek just compensation for the United States Border Patrol's alleged physical taking of eleven parcels of largely undeveloped land ("the subject property") located adjacent to the Mexican Border in San Diego County, California. The Border Patrol has monitored the subject property since the 1970s as part of its mission to prevent, detect, and apprehend illegal aliens seeking to enter the United States. In 1992, Plaintiff Rancho Vista del Mar granted the Border Patrol a twenty-foot-wide easement along the Mexican border to conduct surveillance and law enforcement on foot, by vehicle, or on horseback. However, Plaintiffs allege that the Border Patrol dramatically increased its operations on their land in the aftermath of the September 11, 2001 terrorist attacks, such that the Government engaged in a "permanent and exclusive occupation,"

entitling them to just compensation under the Fifth Amendment Takings Clause. Boise Cascade Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003). The Border Patrol's activity allegedly consisted of patrolling the subject property outside the boundaries of the easement on foot and in vehicles 24 hours per day, assuming stationary positions at various points on the parcels from which they monitored and responded to illegal alien activity, creating new roads without Plaintiffs' permission, installing underground motion-detecting sensors, and constructing a permanent tented structure from which agents would wait and respond to radio calls from station headquarters. Based upon this conduct, Plaintiffs filed three takings actions in this Court in 2006.

Defendant has stipulated to partial liability for the physical taking of an easement on five of the eleven parcels due to the use of the seismic sensors, which the Border Patrol admits having installed between 1999 and 2005. However, Defendant rejects Plaintiffs' attempt to expand this stipulation to an admission of a physical taking of the entire subject property. Defendant does not deny that the Border Patrol engaged in most of the other activities alleged by Plaintiffs above, but disagrees that they rose to the level of a physical taking. Alternatively, even if the Border Patrol's actions did constitute a permanent and physical occupation of Plaintiffs' property, Defendant asserts that Plaintiffs' claims are barred by the applicable six-year statute of limitations in 28 U.S.C. § 2501 (2006). According to Defendant, Plaintiffs' takings claims accrued in the mid-to-late 1990s during the height of the Border Patrol's activities on the subject property. Defendant argues that between 1996 and 1999, the Border Patrol received a massive influx of manpower and resources under an initiative called "Operation Gatekeeper." Defendant contends that this heightened presence decreased in 1999 as the Border Patrol began temporarily detailing agents to other locations experiencing higher levels of illegal alien activity. Therefore, if a physical taking occurred, then Plaintiffs' claims accrued by the late 1990s and are beyond the statute of limitations.

Plaintiffs' theory linking the Border Patrol's activity to the changed national security landscape after the September 11, 2001 attacks is intuitively attractive, but it lacks any evidentiary basis. Defendant presented evidence at trial supporting the conclusion that the Border Patrol significantly expanded the size and scope of its presence on the subject property in the mid-to-late 1990s and decreased its presence from 1999 to the early 2000s. Plaintiffs' representatives attempted to refute this evidence by offering anecdotal testimony that they noticed an increase in the number of Border Patrol agents on the property, and that agents began stopping them more frequently after September 11, 2001. The Court found this testimony unconvincing. Accordingly, for the reasons explained more fully below, the Court concludes that Plaintiffs' claims accrued between 1996 and 1999 and are barred by the statute of limitations. However, Plaintiffs are entitled to a judgment of partial liability against Defendant for the physical taking of an easement due to the use of motion-detecting sensors on five of the eleven parcels, as stipulated by Defendant.

<u>History of the Litigation</u>

These cases have a unique history before this Court.  On March 3, 2006, Plaintiffs Otay Mesa Property L.P., Rancho Vista Del Mar, and Otay International LLC filed a Complaint ("Otay Mesa Complaint" or "Otay Mesa Case") seeking to recover just compensation for the Border Patrol's alleged Fifth Amendment taking of their property, and the case was assigned to Judge Lawrence Baskir.  On December 4, 2006, Plaintiffs in the Otay Mesa Case filed an unopposed motion to amend their pleadings to add Plaintiffs International Industrial Property ("IIP") and D&D Landholdings ("D&D") to the action. Judge Baskir denied this motion on December 14, 2006.  Accordingly, on December 22, 2006, Plaintiffs IIP and D&D filed two separate Complaints ("IIP Complaint" or "IIP Case" and "D&D Complaint" or "D&D Case"), and the cases were assigned to Judges Thomas Wheeler and Margaret Sweeney respectively.

On October 17, 2007, Defendant filed a motion to dismiss the IIP Complaint, or in the alternative, for partial summary judgment.  Defendant argued that Plaintiff IIP's claim was barred by the six-year statute of limitations and that Plaintiff had failed to state a claim upon which relief could be granted.  On October 26, 2007, Defendant filed with Judge Sweeney a motion to dismiss the D&D Complaint, or in the alternative, for partial summary judgment. On February 22, 2008, Judge Wheeler denied Defendant's motion to dismiss the IIP Complaint after finding that Plaintiff IIP had offered adequate factual support to show, by a preponderance of the evidence, that its claims were not time-barred by the Court's statute of limitations.  <u>Int'l Indus. Park, Inc. v. United States</u>, 80 Fed. Cl. 522, 528 (2008) (citation omitted).  The Court ruled that it had the requisite subject matter jurisdiction but stated that "[i]f going forward, the facts and circumstances relating to the accrual of the cause of action demonstrate that Plaintiff's claims are time-barred by the six-year statute of limitations, the Court may dismiss for lack of subject matter jurisdiction at that time."  <u>Id.</u> (citations omitted).

On May 2, 2008, Plaintiffs Otay Mesa Property L.P., Rancho Vista Del Mar, and Otay International LLC and Defendant jointly filed with Judge Baskir a motion to consolidate the Otay Mesa Case with the D&D and IIP Cases for trial.  Plaintiff D&D and Defendant filed an identical motion with Judge Sweeney.  On May 6, 2008, Judge Baskir granted the motion to consolidate the Otay Mesa Case with the IIP Case in order to "promote docket efficiency and . . . assist in the efficient administration of justice."  J. Baskir Op. & Order 1, May 6, 2008.  On June 3, 2008, Judge Baskir reassigned the Otay Mesa Case to Judge Wheeler for future proceedings.

On June 25, 2008, Judge Sweeney issued an opinion under seal, which she reissued as a published opinion on June 30, 2008, denying Defendant's motion to dismiss the D&D Case.  The Court concluded that Plaintiff D&D had "presented facts demonstrating, by a preponderance of the evidence, that the court possesses jurisdiction over its complaint.  In the event that facts presented at trial prove that plaintiff's cause of action accrued more than six years prior to the filing of the complaint, the court may properly dismiss its complaint as stale."  <u>D&D Landholdings v. United States</u>, 82 Fed. Cl. 329, 343 (2008) (citations omitted).

On July 1, 2008, Judge Sweeney granted the partes' joint motion to consolidate the D&D Case with the IIP Case and issued an order transferring the D&D Case to Judge Wheeler.

On August 28, 2008, Defendant filed a stipulation of partial liability for the placement of motion sensors on parcels 1, 3, 4, 5, and 10.  Def.'s Stip. ¶ 1, Aug. 28, 2008.[1]  The stipulation acknowledged that the Border Patrol had installed fourteen seismic intrusion sensors at various underground locations on the subject property between April 1999 and November 2005.  Id. ¶¶ 5-6.  The sensors are each approximately one cubic foot in size and project a one foot long antenna above ground once buried.  Id. ¶ 3.  They can detect ground motion 30 feet in each direction.  The Border Patrol would not disclose the sensors' exact locations in order to preserve their effectiveness.  Id. ¶ 4.  Defendant stipulated that "by virtue of its placement of the 14 sensors . . . on the listed parcels of land, it had taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed . . . ."  Id. ¶ 6.  The stipulation described the easement as:

> A perpetual and assignable easement to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location.  The easement shall be deemed to have commenced on the date the sensor is listed as having been installed, and will continue until the sensor is no longer needed or the property is developed.  Each sensor is and shall be located so as not to affect the functionality of the property.  Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property.  Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate . . . .

Id. ¶ 7.  Plaintiffs state that they had no knowledge of the sensors until this litigation, and Defendant did not persuasively assert otherwise.

During October 21-29, 2008, the Court conducted a seven-day trial in San Diego, which included a site visit to the subject property on the first day.  The following witnesses testified:  Roque De La Fuente II, Director of American International Enterprises, Inc. ("AIE") and part owner of the subject property; David Wick, President of National Enterprises, Inc. and part owner and manager of the subject property; Jose Luis Andreu, President of AIE and consultant on issues concerning development and construction of the subject property; Robert A. Greninger, Project Manager for J.T. Kruer & Company and on-

---

[1] Defendant filed a corrected version of the stipulation on October 16, 2008.

site construction manager; Victor C. Novik, Senior Biologist for REC Consultants, Inc.; Robert Hixson III, real estate broker and First Vice President for CB Richard Ellis, Inc.; Marco Tulio Montanes Rumayor, former law clerk to the Marzulla law firm; Randy Tagg, Certified General Real Estate Appraiser for The Tagg Company; Stephen D. Roach, MAI, Principal for Jones, Roach & Caringella, Inc.; and Susan Wynn, Biologist for the United States Fish and Wildlife Service.  In addition, the following former and current employees of the United States Customs and Border Protection testified: Border Patrol agents Omar A. Ramirez, Alexander Roozen, Benjamin Davis, James Dee, Andrew R. Jones, Michael D. Hance, Darren Kerns, Michael J. Diaz, Curtis Weatherred III, Kevin A. Barnes, and Brad Beales; road grade operator Otis Harper; facilities management officer Joseph A. Granata; acting assistant chief Oscar Pena; and chief patrol agent for the San Diego Sector Office, Michael J. Fisher.

Following trial, the parties submitted post-trial briefs on January 21, 2009 and reply briefs on February 17, 2009.  The Court heard closing arguments on March 18, 2009.

Findings of Fact[2]

A.  The Subject Property

The property at issue in this case comprises eleven parcels of largely undeveloped land located in the Otay Mesa area of San Diego County, California.  Stip. ¶ 1, Aug. 28, 2008.[3]  Various members and business associates of the Roque De La Fuente II family own the properties through the following Plaintiff entities: Otay Mesa Property, L.P., Rancho Vista del Mar, Otay International, LLC, OMC Properties, LLC, D&D Landholdings, LP ("D&D"), and International Industrial Park, Inc. ("IIP").  Id. ¶¶ 2-12.  A brief description of the eleven parcels is as follows:

• Parcel 1 consists of 74.55 acres and was acquired by Plaintiff Otay Mesa Property, L.P. from National Enterprises, Inc. by deed recorded on May 31, 2001.  Id. ¶ 2.  It is subject to three utility easements that cross the parcel in a southeast to northwest direction and extend 290 feet in width.  Id.

---

[2]  This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the Court of Federal Claims.  Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[3]  In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to trial exhibits as "PX __" for Plaintiffs' exhibits and "DX__" for Defendant's exhibits.  The parties' joint pretrial stipulations of fact, filed on August 28, 2008, are referred to as "Stip. __."  For multi-page exhibits, the Court has included citations to page numbers or to the parties' Bates numbers used during this case.

- Parcel 2 consists of 120 acres and was acquired by 3250 Corporation from Milton Fredman, Trustee for V&V Development, Co., by deed recorded on October 19, 1982. Id. ¶ 3. 3250 Corporation changed its name to Rancho Vista del Mar on August 21, 1987. Id. Parcel 2 has several outstanding easements, including a Mitigation Credit dated March 8, 2002, in favor of Otay Hills, LLC. Id.

- Parcel 3 consists of 393.6 acres and was acquired by 3250 Corporation, now Plaintiff Rancho Vista del Mar, by deed recorded on October 19, 1982 as part of the same deed transaction as Parcel 2. Id. ¶ 4. Several outstanding conservation easements and open space easements exist on Parcel 3. DX 550, 552, 556, 560, 561, 571, 700(27).

- Parcel 4 consists of 160 acres and was acquired by Plaintiff Otay International, LLC from American International Enterprises, Inc. by deed recorded on December 3, 2003. Stip. ¶ 5.

- Parcel 5 consists of 120 acres and was acquired by 3250 Corporation, now Plaintiff Rancho Vista Del Mar, by deed recorded on October 19, 1982 as part of the same deed transaction as Parcels 2 and 3. Id. ¶ 6. It is subject to three easements: a 20 foot and 120 foot easement acquired by San Diego Gas & Electric ("SDG&E") on September 24, 1985, a 60 foot ingress and egress easement acquired on December 22, 1997, and a 20 foot gas pipeline easement acquired on June 3, 2003. DX 700(28).

- Parcel 6 consists of 79.58 acres and was acquired by OMC Properties, LLC from Otay Mesa Property L.P. on January 7, 2004. Stip. ¶ 7. It is subject to an SDG&E easements acquired on October 20, 1948, April 2, 2002, and June 16, 2006, slope and drainage easements acquired on January 8, 1988 and June 7, 2006, a sewer easement acquired on February 27, 2001, a utility easement acquired on March 8, 2002, conservation and open space easements acquired on May 31, 2006, a county easement, and a public highway easement. DX 700(33)-(34).

- Parcel 7 consists of 6.34 acres and was acquired by 3250 Corporation, now Plaintiff Ranch Vista Del Mar, as part of the same transaction as parcels 2, 3, and 5. Stip. ¶ 7. It is subject to a 30 foot road easement acquired on January 15, 1965, a 100 foot road easement acquired on April 12, 1991, and a slope and drainage easement acquired on October 30, 1991. DX 700(29).

- Parcel 8 consists of approximately 5.00 acres and was acquired by 3250 Corporation, now Plaintiff Ranch Vista Del Mar, as part of the same transaction as parcels 2, 3, 5, and 7. Stip. ¶ 9. It is subject to a public highway and slope easement acquired on August 6, 2002. DX 700(30).

-6-

• Parcel 9 consists of 51.47 acres and was acquired by Plaintiff Ranch Vista Del Mar in two separate transactions. Stip. ¶ 10. The first occurred on October 19, 1982 as part of the same transaction as parcels 2, 3, 5, 7, and 8. Id. The second took place on March 13, 2002 when Plaintiff Ranch Vista Del Mar acquired the remaining portion of the parcel from KYDDLF & RDLF, LLC. Id. The United States obtained an easement over portions of the parcel for use as a helicopter training site and for a fire access road and fuel break on November 9, 1990. Id.

• Parcel 10 consists of 134.89 acres and was acquired by Plaintiff D&D from Plaintiff Rancho Vista Del Mar by a document recorded on December 18, 2000. Id. ¶ 11. It is subject to SDG&E easements acquired on September 24, 1985 and June 16, 2006, slope and drainage easements acquired on June 2, 2006 and June 7, 2006, a pipeline easement acquired on February 27, 2001, a public highway easement acquired on June 10, 2004, and an ingress and egress easement acquired on July 9, 1984. DX 700(35)-(36).

• Parcel 11 consists of 95.47 acres and was acquired by 275 Corporation by deed recorded on June 27, 1983. Stip. ¶ 12. On August 21, 1987, 275 Corporation changed its name to Rancho De La Fuente, and on September 14, 1992, Rancho De La Fuente changed its name to Plaintiff IIP. Id. Parcel 11 is subject to SDG&E easements acquired on October 20, 1948, February 16, 1962, March 5, 1962, and June 21, 1977, road easements acquired on January 25, 1962, January 15, 1965, August 21, 1990, and April 10, 1997, pipeline easements acquired on January 25, 1962 and October 26, 1966, utility easements acquired on August 21, 1990 and April 10, 1997, slope easements acquired on September 4, 1990 and August 6, 2002, and public highway easements acquired on August 6, 2002 and June 10, 2004. DX 700(32).

**The Subject Property**



B.  The Border Patrol's Mission and Organization

Founded in 1924, the Border Patrol serves as the lead federal agency charged with securing the international border between official ports of entry into this country.  DX 570, DHS21498.  Its mission traditionally has been to protect the United States by gaining operational control of the border and to prevent, detect, and apprehend persons seeking to enter the United States illegally.  Id.  Following the terrorist attacks of September 11, 2001, Congress expanded the Border Patrol's mission to include preventing the entry of terrorists and weapons of mass destruction along the border.  Id.  Congress also dissolved the Immigration and Naturalization Service and placed the Border Patrol under the United States Department of Homeland Security, Bureau of Customs and Border Protection.  Id.  In the course of discharging its duties, the Border Patrol monitors 8,000 miles of the United States' international borders with Mexico and Canada and the coastal waters around Florida and Puerto Rico.  Id.  DHS21499.

The Border Patrol is divided into Sectors, nine of which operate along the Southwest Border from California to Texas, and is subdivided further into areas of geographical responsibility known as Stations.  DX 700(65); Fisher, Tr. 1155-56.  The San Diego Sector Office patrols approximately sixty linear miles of the Mexican border from the Pacific Ocean eastward to the Imperial County line in California, an area which includes the Mexican cities of Tijuana and Tecate.  DX 593, DHS23296; DX 700(72); Fisher, Tr. 1157.  The terrain within this area presents few geographical barriers to entry by illegal immigrants and smugglers.  DX 593, DHS23296.  Within the San Diego Sector Office, there are six Border Patrol Stations situated along the border and two Border Patrol Stations that operate checkpoints inland from the border.  Fisher, Tr. 1157.  The territory within the San Diego Sector Office's enforcement responsibility is divided administratively into 32 zones, commencing with Zone 1 at the Pacific Ocean and running eastward to Zone 32 at the Imperial County line, each of which is assigned to a particular Station.  DX 700(72); Fisher, Tr. 1158.  The subject property is located primarily in Zones 17 and 18, with a small portion falling in Zone 16.  DX 700(62).  From 1992 until April 2004, Brown Field Station within the San Diego Sector Office had responsibility for operations in Zones 16, 17 and 18.  DX 800(33); DX 800(9); Hance, Tr. 1218; Barnes, Tr. 1794.  In April 2004, Chula Vista Station took over operational control of Zones 17 and 18 from Brown Field Station.  DX 800(9); DX 800(33).

C.  Border Patrol Operations on the Subject Property

    1.  1970s-1980s: Limited Border Patrol Activity

The Border Patrol began patrolling the subject property for illegal aliens in the 1970s. Jones, Tr. 1183-84.  At that time, approximately twelve to fourteen agents per shift patrolled areas under the San Diego Sector's responsibility.  Id.  From at least 1982 onward, illegal alien traffic crossed the Mexican border to the subject property, and the Border Patrol patrolled the area to the extent that available manpower permitted.  Jones, Tr. 1186-88.  The area from the Pacific Ocean to the foothills of the San Ysidro Mountains in the vicinity of Plaintiffs' land hosted the most concentrated area of illegal entries along the Southwest Border.  DX 523, 183.  Approximately 300-500 illegal aliens crossed parcels 1, 5, 6, and 10 daily, according to San Diego County.  DX 505, DPLU00918; Andreu, Tr. 333.  During the 1980s, the Border Patrol deployed approximately 30-40 agents to patrol the entire area between the Pacific Ocean and Otay Mountain.  PX 2, COTB00133.  Agents monitored illegal alien activity from Tin Can Hill, located on parcel 3 of the subject property, by stationing agents there during the day and with infrared telescopes at night.  Jones, Tr. 1190-91.  Illegal aliens used Johnny Wolf's Draw, located on parcel 1, extensively to cross into the United States.  Pena, Tr. 1558-60.

Mr. De La Fuente, Mr. Wick, and Mr. Andreu, part owners and managers of the subject property, rarely saw illegal aliens or Border Patrol agents on Plaintiffs' land during the 1980s.  De La Fuente, Tr. 206-10; Andreu, Tr. 336-39; Wick, Tr. 525-29, 535-36.  They all testified that the Border Patrol almost never stopped or questioned them when they visited the subject property.  De La Fuente, Tr. 206-08; Wick, Tr. 527; see also Andreu, Tr. 336-37.  Mr. De La Fuente was aware that the Border Patrol was patrolling his property as early as 1985.  De La Fuente, Tr. 253-55.

In 1984, the Border Patrol entered into a lease with Plaintiff Rancho Vista Del Mar for use of a twenty-foot strip of property along parcels 1 and 3.  De La Fuente, Tr. 253-54; PX 118(a)-(d).  No documentary evidence of the agreement was produced at trial other than copies of the checks Plaintiffs received from the Government, so the terms of the lease are unclear.  See PX 18(a)-(d).  The parties renewed the lease yearly from 1985 to 1988.  De La Fuente, Tr. 255, 320; PX 118(a)-(d).  By 1987, the Border Patrol began accessing Otay Truck Trail, a public road, by crossing the subject property without Plaintiffs' express consent. Jones, Tr. 1207-11; Hance, Tr. 1273-74; Roach, Tr. 1623-26; De La Fuente, Tr. 274; DX 700(1A).  In 1990, the Border Patrol acquired from Mr. De La Fuente a legal right of access to travel from Alta Road to the Otay Truck Trail on a fifty-foot easement.  DX 516, 518, 520.

2. <u>Early 1990s: Construction of the Primary Fence</u>

In an effort to stem the large number of illegal entries into the United States, in 1990, the United States Government began constructing a ten-foot-high physical barrier ("the primary fence") along the Mexican border made of welded steel landing mats. DX 593, DHS23296-97. The primary fence was completed in 1993 and extends from the Pacific Ocean for fourteen miles to the east, terminating approximately 300 feet west of the easternmost boundary of parcel 3. <u>Id.</u>; DX 700(62). Construction of the primary fence significantly reduced the number of "drive-throughs," or vehicles that would drive across the border at high speeds carrying illegal aliens or drugs, but it had little impact on illegal pedestrian traffic over the subject property. Jones, Tr. 1193; Pena, Tr. 1579-80; Barnes, Tr. 1810; Beales, Tr. 1821-22.

In 1992, the Border Patrol acquired a twenty-foot-wide easement along the Mexican border from Plaintiff Rancho Vista Del Mar for the purpose of conducting "[s]urveillance and law enforcement . . . at all hours of day or night, seven days per week, by government vehicle, horseback, or on foot," which renewed automatically each year until September 30, 2002 unless the Government gave 30 days notice of its intent to terminate the agreement. DX 521, DHS23339. The easement also authorized construction of the primary fence on the subject property. <u>Id.</u>

3. <u>Mid-to-Late 1990s: Increased Border Patrol Presence</u>

a. Operation Gatekeeper

In October 1994, the Border Patrol announced the commencement of Operation Gatekeeper, which called for large increases in the San Diego Sector's overall manpower and deployment of agents directly along the border to deter illegal entry. DX 593, DHS23297. The strategic plan set forth three tiers of agent deployment: the first would deploy to fixed positions on the border to prevent illegal entry, apprehend those who attempted to enter, and monitor the border; the second would deploy north of the border to contain and apprehend traffic that eluded the first tier of agents; and the third assigned agents to staff vehicle checkpoints further inland. <u>Id.</u> Operation Gatekeeper resulted in significant increases in manpower and other resources deployed to the San Diego Sector. <u>Id.</u> Between October 1994 and June 1998, the San Diego Sector saw a 150 percent increase in manpower; a 152 percent increase in the size of its vehicle fleet; a 171 percent increase in the number of seismic sensors deployed; an increase in permanent lighting from one to six miles; deployment of 100 new portable lights; an increase in infrared night-vision goggles from 12 to 49; and an increase in its helicopter fleet from six to ten. <u>Id.</u>

In 1996, Operation Gatekeeper's additional resources and manpower reached Brown Field Station, the station responsible for patrolling the subject property. Hance, Tr. 1231-32; Barnes, Tr. 1795. Staffing under Brown Field Station's command grew from six to eight agents per shift to 30-35 agents per shift, resulting in an increased number of agents deployed to the East Mesa area, including the subject property. Hance, Tr. 1231-32. Consistent with Operation Gatekeeper's strategic plan, the Border Patrol deployed agents to fixed, stationary positions along the border, including the following positions on the subject parcels: Johnny Wolf's Draw (parcel 1); Tin Can Hill (parcel 3); Gold Mine Draw (parcel 3); and Three Cross Draw (parcel 3). Hance, Tr. 1234; Weatherred, Tr. 1458-59; Beales, Tr. 1824-25; Barnes, Tr. 1796-97; DX 700(62). These stationary positions were highly visible to deter illegal alien entry and allow agents to see one another up and down the line. Hance, Tr. 1235; Beales, Tr. 1824. Despite the influx of manpower, Mr. De La Fuente, Mr. Wick, and Mr. Andreu all testified that they did not notice an increase in Border Patrol presence on the subject property as a result of Operation Gatekeeper or generally in the 1990s. De La Fuente, Tr. 210-11; Andreu, Tr. 336-37; Wick, Tr. 527.

Brown Field Station also received additional night scopes, portable lights powered by generators, and vehicles, including ATVs. Hance, Tr. 1236; Weatherred, Tr. 1461, 1465-66; DX 700(73). The Border Patrol used night scopes to detect illegal alien traffic on the subject property, although the scopes were not positioned on the parcels themselves. Weatherred, Tr. 1465-66, 1510; Ramirez, Tr. 877-80, 901-02; Wick, Tr. 1933; De La Fuente Tr., 228. A night scope operator would monitor the scope and inform agents on the ground of any activity and then guide the agents until they made contact with the illegal aliens. Weatherred, Tr. 1465-66; Ramirez, Tr. 878-80. From mid-1996 through 1999, the Border Patrol positioned portable lights on parcels 1, 3, and 4 to assist with night operations. Hance, Tr. 1236-37, 1271; Weatherred, Tr. 1461; Roozen, Tr. 919-20; DX 577, DHS1817, DHS1842. The portable lights were mounted on trailers and could be transported where needed. Stip. ¶ 40. In late 1997, manpower in the ATV unit at Brown Field Station grew from approximately four to six agents to 22 agents, and the station received approximately 22-24 new vehicles. Barnes, Tr. 1797-99. The Border Patrol also began training new agents to drive ATVs on Tin Can Hill on parcel 3. Barnes, Tr. 1799-1880.

As manpower at Brown Field Station increased, the Border Patrol saw a decrease in the number of illegal aliens attempting to enter the United States across the subject property. Barnes, Tr. 1795-96; Beales, Tr. 1826; Pena, Tr. 1574; Hance, Tr. 1241-42. Smugglers began to move their operations away from the San Diego Sector to the east, and apprehensions within the Sector decreased. Fisher, Tr. 1175; Barnes, Tr. 1795; Beales, Tr. 1826; DX 800(16), (27), (29).

b.  Construction of the secondary fence

Also in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act, which authorized the construction of a second fence along the border in the San Diego Sector to buttress the primary fence.  DX 593, DHS23296.  The steel mesh secondary fence roughly parallels the primary fence and includes access roads and permanent lights and cameras.  DX 593, DHS23300; Stip. ¶ 32.  Construction began in 1996 and continued in stages through 2004, after which construction ceased temporarily due to environmental concerns raised by the California Coastal Commission.  DX 593, DHS23300; Granata, Tr. 1292-1302; Stip. ¶ 34.  The Border Patrol constructed the fence in sections and left gaps where any drainage structures existed because the agency did not have the environmental clearance necessary to build over them.  Granata Tr. 1293-1330; DX 700(25).  In 2005, the Border Patrol resumed work on the secondary fence after Congress passed a law permitting the Department of Homeland Security to waive the California Coastal Commission's legal requirements.  Stip. ¶ 35.  Currently, the secondary fence ends approximately 12.5 miles from the Pacific Ocean, near the western boundary of parcel 1 and leaving approximately 1.5 miles to be completed in the area of the subject property.  DX 700(25), (62); Stip. ¶ 37; Hance, Tr. 1283-85.  Border Patrol agents testified that they saw a dramatic reduction in the number of illegal alien apprehensions after installation of the secondary fence.  Jones, Tr., 1214-15; Hance, Tr. 1286-88.  Defendant agrees that alien apprehensions decreased during the 1998 to 2000 time frame but alleges that the reduction is the result of increased manpower and not construction of the secondary fence, which did not extend beyond the Otay Mesa Port of Entry until 2000.  See Granata, Tr. 1294-99; DX 700(25).  Mr. De La Fuente, Mr. Wick, and Border Patrol Agent Barnes also testified to their personal belief that the 1.5 mile gap in the fence on Plaintiffs' property has had the effect of funneling and encouraging illegal entry across the parcels.  De La Fuente, Tr. 211-13; Wick, Tr. 536, 733-34; Barnes, Tr. 1813-14.

c.  Other Border Patrol activity

Beginning in the Spring of 1995 and continuing until 2002, Border Patrol agent and road grade operator Otis Harper graded the major existing roads that traversed the subject properties but denied creating any new roads.  Harper, Tr. 1530, 1542.  In 1996 and 1997, the Border Patrol placed gravel on the north-south road located in Johnny Wolf's Draw on parcels 1 and 4.  DX 529, ¶ 3.

In late 1999, Border Patrol agents working for the ATV unit set up a tented shelter in the Otay Mountain area located on parcel 3 where they could wait for and respond to sensor activation or radio calls informing them of illegal alien activity.  Barnes, Tr. 1801-02; Beales, Tr. 1833; Ramirez, Tr. 873-74.  The so-called "hootch" consisted of a floor made of landing mats, aluminum poles for a frame, and canvas tarps for a roof.  Barnes, Tr. 1801-02;

Ramirez, Tr. 874-75.   Over time, Border Patrol agents added plywood walls, sofas, a microwave, a barbecue heating barrel, lights, a stove, and a radio, although they did not alter the exterior structure. Ramirez, Tr., 874-75; Weatherred, Tr. 1516-19; Barnes, Tr. 1801-02; PX 83. The hootch remained on the subject property until 2004 when Chula Vista Station took over operational control of the area from Brown Field Station.  Ramirez, Tr. 875.

4.   <u>1999-early 2000s: Temporary Detailing to Other Sectors</u>

Beginning in 1999, the Border Patrol began detailing agents temporarily from the San Diego Sector to Sectors experiencing higher alien traffic because of the shift in smuggling operations to the east. Fisher, Tr. 1175-76; Ramirez, Tr. 892-93; Roozen, Tr. 923; Davis, Tr. 937-39; Jones, Tr. 1205-06; Weatherred, Tr. 1474-75; Beales, Tr. 1827; Pena, Tr. 1573-74. As a result of these temporary details, the Border Patrol did not have sufficient manpower to staff all stationary positions on the East Mesa, including those on the subject property. Beales, Tr. 1828; Weatherred, Tr. 1476, 1483; Ramirez, Tr. 893; Davis, Tr. 939. Agents only staffed Tin Can Hill (parcel 3) and Well Draw (parcel 3), but not Johnny Wolf's Draw (parcel 1), Goldmine Draw (parcel 3), or Three Cross Draw (parcel 3). Beales, Tr. 1828; Weatherred, Tr. 1476, 1483; Ramirez, Tr. 893.

Following the terrorist attacks of September 11, 2001, the Border Patrol temporarily detailed agents from the San Diego Sector to New York City.  Weatherred, Tr. 1475-76. Agent Weatherred testified that a number of his colleagues left the Border Patrol to join the Air Marshal's Service. <u>Id.</u> The Border Patrol deployed more agents to the East Mesa, including the subject property, each year during the 1996 to 1999 time frame than from 2000 to 2006. DX 800(32); Weatherred, Tr. 1504. By 2001, the number of agents on Brown Field Station's ATV unit available to patrol the subject property declined to six per shift. Beales, Tr. 1829-30.

Despite the temporary detailing of agents to other Sectors, Mr. De La Fuente, Mr, Wick, and Mr. Andreu testified that they saw a substantial increase in Border Patrol activity on Plaintiffs' land after September 11, 2001. De La Fuente, Tr. 211-13, 221; Andreu, Tr. 339; Wick, Tr. 529-30, 536-37. Mr. Wick stated that he had seen Border Patrol agents on all of the parcels routinely during his visits to the subject property following September 11, 2001. Wick, Tr. 538-64. Various agents and employees of Plaintiffs reported that the Border Patrol had stopped, followed, or chased their vehicles whenever they entered the subject property. De La Fuente, Tr. 213-16; Andreu, Tr. 343-46; Novik, Tr. 430-32; Tagg, Tr. 1032-35; PX 122. Mr. Wick also testified that he had seen the Border Patrol grading roads on the parcels "on a regular basis since 2002." Wick, Tr., 1920; see also Wick, Tr., 1949-52.

### 5. 2004: Construction of the Drainage System at Box Culvert 4

In 2004, the United States Government constructed a drainage structure known as Box Culvert 4 ("BC-4") south of parcel 1 to allow water to flow unimpeded from the United States to Mexico as required by an international treaty. Granata, Tr. 1305, 1308-09, 1311-12; DX 700(25). Because the drainage pipes at BC-4 are large enough to allow a person to walk through them, the Government originally installed electrically-powered grates that opened to allow high velocity water flows to pass through and closed to prevent illegal aliens from entering the United States. Granata, Tr. 1309, 1312-13, 1315-16. However, in late 2006 or early 2007, after aliens had removed the electrical wiring and motors to open and close the gates, the Government welded the drainage structure open so that water could flow through the pipes unimpeded. Granata, Tr. 1310, 1313.

### D. Public Use of the Subject Property

Since at least 1982, members of the general public have used the subject property for recreational purposes such as riding off-road vehicles. De La Fuente, Tr. 208; Novik, Tr. 444-45; Hance, Tr. 1271; Weatherred, Tr. 1484, 1496; Davis, Tr. 939; Beales, Tr. 1832-33. Off-roaders bring their trucks, ATVs, motorcycles, and other vehicles to a staging area near Alta Grove, just south of parcel 6 and not located on the subject property. Davis, Tr. 939-40; Barnes, Tr. 1803-05; Beales, Tr. 1832; Pena, Tr. 1570-72. From there, they ride on and in the vicinity of the subject property, including Tin Can Hill (parcel 3), the 644 Trap (parcel 3), Pole Line Road (along parcels 1, 5, 9, 10), and roads connecting to it. Davis, Tr. 939-40; Barnes, Tr. 1803-05; Beales, Tr. 1832-33; Weatherred, Tr. 1496; Pena, Tr. 1570-72. Sometimes on weekends there were so many off-roaders on the subject parcels that Border Patrol agents believed that they posed a threat to the agents' safety. Davis, Tr. 941-43. Fire and rescue personnel employed by the City of San Diego, San Diego County, and the California State Department of Forestry frequently responded to fire or medical emergencies involving members of the general public injured in the area of the subject property, including parcels 5 and 10. Barnes, Tr. 1805-07; Beales, Tr. 1836. In 1988, off-roaders created a new road on parcel 10 as a shortcut from Pole Line Road to Alta Grove. Pena, Tr. 1572-73. Plaintiffs argue, however, that off-roaders have never interfered with their ability to show or lease their property because the recreational vehicle site is located off the subject property. Wick, Tr. 658-59, 1938-42.

<u>Discussion</u>

A.  <u>The Court Lacks Jurisdiction Over Claims Filed More than Six Years After a</u>
<u>Cause of Action Accrues.</u>

The Tucker Act grants the Court of Federal Claims exclusive jurisdiction over Fifth
Amendment Takings claims brought against the United States for amounts greater than
$10,000.  <u>Morris v. United States</u>, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citation omitted).
The Takings Clause of the Fifth Amendment provides that: "nor shall private property be
taken for public use, without just compensation." U.S. Const. amend. V, cl. 4.  The Supreme
Court has recognized two kinds of compensable takings: (1) actual takings, through the
Government's physical invasion or appropriation of private property, or (2) regulatory
takings, through government regulations that unduly burden private property interests.  <u>See</u>
<u>Huntleigh USA Corp. v. United States</u>, 525 F.3d 1370, 1378 (Fed. Cir. 2008), <u>cert. denied</u>,
129 S. Ct. 626 (2008) (citations omitted).  In the present case, Plaintiffs have alleged a
physical taking.

However, a Tucker Act claim is "barred unless the petition thereon is filed within six
years after such claim first accrues."  28 U.S.C. § 2501.  The six-year statute of limitations
is a jurisdictional prerequisite for filing suit in this Court and may not be waived under the
doctrine of equitable tolling.  <u>John R. Sand & Gravel Co. v. United States</u>, 457 F.3d 1345,
1354-55 (2006), <u>aff'd</u>, 128 S. Ct. 750 (2008) (citations omitted).  A Fifth Amendment takings
claim accrues "when all the events have occurred which fix the liability of the Government
and entitle the claimant to institute an action."  <u>Goodrich v. United States</u>,434 F.3d 1329,
1333 (2006) (quoting <u>Hopland Band of Pomo Indians v. United States</u>, 855 F.2d 1573, 1577
(Fed. Cir. 1988)); <u>see also</u> <u>John R. Sand,</u> 457 F.3d at 1355-56 (citations omitted); <u>Bowen v.</u>
<u>United States</u>, 292 F.3d 1383, 1385 (Fed. Cir. 2002) (citation omitted); <u>Kemp v. United</u>
<u>States</u>, 65 Fed. Cl. 818, 825 (2005) (citation omitted).  In determining when the claim
accrues, courts apply an objective standard.  <u>Fallini v. United States</u>, 56 F.3d 1378, 1380
(Fed. Cir. 1995), <u>cert. denied</u>, 517 U.S. 1243 (1996) (citation omitted).

Furthermore, the claim only accrues if "the plaintiff knew or should have known of
the existence of events fixing the government's liability."  <u>John R. Sand</u>, 457 F.3d at 1356
(citations omitted); <u>Goodrich</u>, 434 F.3d at 1333 (quoting <u>Kinsey v. United States</u>, 852 F.2d
556, 557 n.* (Fed. Cir. 1988)).  Where the Government's actions are open and notorious, the
plaintiff is on inquiry notice, and the statute of limitations begins to run.  <u>Ingrum v. United</u>
<u>States</u>, 560 F.3d 1311, 1317 (Fed. Cir. 2009) (holding that the Government's excavation of
fill material from the plaintiff's property to repair a road over which it had a right of entry
put the plaintiff on inquiry notice of the alleged taking, even though the plaintiff did not learn
of the borrow pit until later, because the pit was in plain sight and clearly visible from the
road); <u>Coastal Petroleum Co. v. United States</u>, 228 Ct. Cl. 864, 864 (1981) (finding the

Government's actions open and notorious where the construction project was widely reported in the state news media); Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 408-09 (1994) (concluding that the Government's bombing exercises on the plaintiff's property placed the plaintiff on inquiry notice of the unexploded ordnance on his property).

### B. Plaintiffs' Claims are Barred by the Six-Year Statute of Limitations.

The issue before this Court is to determine when Plaintiffs' alleged takings claims accrued. Plaintiffs IIP and D&D filed their Complaints on December 22, 2006, and the remaining Plaintiffs filed their Complaint on March 3, 2006. Therefore, the Court only has jurisdiction to decide Plaintiffs' claims if the Government's alleged physical taking accrued on or after December 22, 2000 or March 3, 2000, depending on the parcel at issue.

A physical taking occurs when a "permanent and exclusive occupation by the government . . . destroys the owner's right to possession, use, and disposal of the property." Boise Cascade Corp., 296 F.3d at 1353. Thus, the physical intrusion must rise to the extreme level of a "permanent" physical occupation. Hendler v. United States, 952 F.2d 1364, 1376 (Fed. Cir. 1991) (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982)). However, "'permanent' does not mean forever, or anything like it." Id. The Government's physical occupation is "permanent" if the intrusion is a substantial physical occupancy of private property. See id. at 1377. The occupation need not be exclusive, or continuous and uninterrupted to constitute a taking. Id. (placement of groundwater monitoring wells on the plaintiff's property and the Government's periodic presence to install and service the wells was a physical taking); Loretto, 458 U.S. at 441 (placement of cable and connection boxes on the plaintiff's property amounted to a physical taking). But see Boise Cascade Corp., 296 F.3d at 1356 (the brief entrance of Government surveyors on the plaintiff's property over a five-month period did not qualify as a physical taking). Thus, a permanent physical occupation occurs "where individuals are given a permanent and continuous right to pass to and fro . . . even though no particular individual is permitted to station himself permanently upon the premises." Ridge Line, Inc. v. United States, 346 F.3d 1346, 1352 (Fed. Cir. 2003) (quoting Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 831-32 (1987)).

The Court's inquiry into a claim's accrual under the statute of limitations is highly fact-specific. John R. Sand, 457 F.3d at 1357. A claim for the taking of an easement based on repeated Government use may begin as a mere trespass but ripen into a takings claim over time. See Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 329-30 (1922) ("[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove it."). One test is whether the Government's activity materially and substantially interferes with the plaintiff's use and enjoyment of his property. See Aaron v. United States, 311 F.2d 798, 800 (Ct. Cl. 1963) (declining to find a taking due

to aircraft overflights where only two planes flew over the property per day but finding a physical taking when flights increased to a dozen per day); see also Klein v. United States, 152 Ct. Cl. 221, 223-24 (1961), cert. denied, 366 U.S. 936 (1961) (concluding that a takings claim did not accrue when overflights caused the plaintiffs mere inconvenience from noise and vibration but only when the conditions became intolerable).

1.  Plaintiffs' Claims Accrued Between 1996 and 1999.

The Court concludes that Plaintiffs' takings claims accrued between 1996 and 1999, a time period marked by an influx of manpower and resources to Brown Field Station as a result of Operation Gatekeeper and the Border Patrol's construction of the hootch on the subject property.  Based on the evidence and testimony heard at trial, the Court does not find that the Border Patrol's activity on Plaintiffs' property prior to 1996 rose to the level of a "permanent and exclusive occupation."  See Boise Cascade Corp., 296 F.3d at 1353.  Nor does the Court subscribe to Plaintiffs' theory that the Government's alleged physical taking arose out of the Border Patrol's expanded mission in response to the terrorist attacks of September 11, 2001.  Indeed, the evidence shows that the Border Patrol's presence on the subject properties declined beginning in 1999 and again in the aftermath of September 11, 2001 as the agency detailed agents temporarily to other locations.

The Border Patrol began patrolling the subject property in the 1970s but maintained a limited presence with only twelve to fourteen agents covering the entire San Diego Sector per shift.  Jones, Tr. 1183-84.  From the 1980s forward, illegal alien activity on the subject property increased significantly, with anywhere from 300 to 500 illegal aliens crossing parcels 1, 5, 6, and 10 daily.  DX 505, DPLU00918; Andreu, Tr. 333.  Border Patrol agents patrolled the subject property to the extent that manpower permitted, but the agency deployed only approximately 30-40 agents to the entire area between the Pacific Ocean and Otay Mountain.  PX 2, COTB00133.  Agents also began stationing themselves on Tin Can Hill on parcel 3.  Jones, Tr. 1187-88, 1190-91.  The Border Patrol's presence on the parcels in the 1980s was sporadic and transient at best, and neither party argues that a physical taking occurred at that time.  See John R. Sand, 457 F.3d at 1357 ("a transient and relatively inconsequential incursion by the government . . . is not sufficiently permanent to comprise a taking.") (citation omitted).

However, the Border Patrol's presence on the subject property grew from sporadic to pervasive by the mid-to-late 1990s with the initiation of Operation Gatekeeper in 1994. Operation Gatekeeper called for large increases in the San Diego Sector's overall manpower as well as deployment of agents directly along the border to deter illegal entry.  DX 593, DHS23297.  As a whole, the San Diego Sector saw a 150 percent increase in manpower; a 152 percent increase in the size of its vehicle fleet; a 171 percent increase in the number of seismic sensors deployed; an increase in permanent lighting from one to six miles;

-18-

deployment of 100 new portable lights; an increase in infrared night-vision goggles from 12 to 49; and an increase in its helicopter fleet from six to ten. Id. By 1996, Operation Gatekeeper's influx of manpower reached Brown Field Station. Hance, Tr. 1231-32; Barnes, Tr. 1795. Staffing under Brown Field Station's command grew from six to eight agents per shift to 30-35 agents per shift, which resulted in an increased number of agents deployed to the subject property. Hance, Tr. 1231-32. The Border Patrol also deployed agents to fixed, stationary positions on Plaintiffs' land, including: Johnny Wolf's Draw (parcel 1); Tin Can Hill (parcel 3); Gold Mine Draw (parcel 3); and Three Cross Draw (parcel 3). Hance, Tr. 1234; Weatherred, Tr. 1458-59; Beales, Tr. 1824-25; Barnes, Tr. 1796-97; DX 700(62). Agents assigned to stationary positions were required to remain within 200 hundred yards of their fixed positions and maintain high visibility in order to deter illegal entry. Weatherred, Tr. 1456-57. By 1998, all of the stationary positions described above were manned during the daytime shifts. Hance, Tr. 1234-35; Weatherred, Tr. 1458-60.

Beyond manpower, Brown Field Station received additional resources such as night scopes, which it used to detect illegal alien traffic on the subject properties. Hance, Tr. 1236; Weatherred, Tr. 1465-66; Ramirez, Tr. 877-80, 901-02; Wick, Tr. 1933. The Border Patrol also began positioning portable lights on parcels 1, 3, and 4 to assist with night operations but removed them by 1999. Hance, Tr. 1236-37, 1271; Weatherred, Tr. 1461; Roozen, Tr. 919-20; DX 577, DHS1817, DHS1842. In late 1997, the Border Patrol increased manpower in the ATV unit at Brown Field Station from approximately four to six agents to 22 agents, and the Station received approximately 22-24 new vehicles. Barnes, Tr. 1797-99. The agency also split the unit into two shifts in order to ensure round-the-clock patrolling. Barnes, Tr. 1799. Finally, the Border Patrol began training new agents to drive ATVs on Tin Can Hill on parcel 3. Barnes, Tr. 1799-80.

The Border Patrol also physically altered the terrain on the subject property during the mid-to-late 1990s. In 1995 and every year thereafter until 2002, Border Patrol agent and road grade operator Otis Harper graded the major existing roads that traversed the subject property. Harper, Tr. 1530, 1542. In 1996, the Border Patrol also began placing gravel on two roads on Plaintiffs' land as part of its effort to rebuild and improve Otay Truck Trail. DX 529, ¶3. Finally, in 1999, Border Patrol agents working in the ATV unit constructed the hootch on parcel 3. Barnes, Tr. 1801-02; Beales, Tr. 1833; Ramirez, Tr. 873-74. Shortly thereafter, agents ran an extension cord from a nearby portable light to the hootch to provide electricity and brought in sofas, a microwave, a barbecue heating barrel, lights, a stove, and a radio. Ramirez, Tr., 874-75; Weatherred, Tr. 1516-19; Barnes, Tr. 1801-02; PX 83.

If the Border Patrol's activity on Plaintiffs' property ever arose to a "permanent and exclusive occupation," it did so between 1996 and 1999. In John R. Sand, the Federal Circuit held that a physical taking occurs when the Government's use (1) destroys the plaintiff's right to exclude others from its property and (2) inhibits his right to use its property free of

interference.  See 457 F.3d at 1358.  In that case, the Environmental Protection Agency ("EPA") fenced off the plaintiff's leasehold interest in a tract of land over which it held the exclusive right to mine sand and gravel in order to remediate a nearby landfill superfund site. Id. at 1347.  Over the course of its cleanup operations, the EPA constructed numerous fence configurations from 1992 to 1998 in order to restrict public access to different areas of the site, although the lessee continued to mine sand and gravel as late as 1996.  Id. at 1347-49. The Federal Circuit concluded that the taking claim accrued in 1994 when the EPA erected a fence that cut off the plaintiff's access to its mining plant area, even though the EPA later relocated portions of the fence.  Id. at 1357.  At that time, the EPA had destroyed the plaintiff's ability to exclude others from its leasehold and had prevented it from using the property free of interference, "effectively declar[ing] itself a co-tenant" of the property. Id. at 1358.

In the present case, the Border Patrol's presence on the subject property reached its peak in the mid-to-late 1990s when the agency ramped up the manpower assigned to Brown Field Station, deployed agents to stationary positions on the subject property, and patrolled the parcels 24 hours per day on ATVs.  At that time, the Border Patrol's activity essentially amounted to a " permanent and continuous right to pass to and fro . . . ." Ridge Line, Inc., 346 F.3d at 1352 (quoting Nollan, 483 U.S. at 831-32).  Just as the Government installed groundwater monitoring wells in Hendler and cable boxes in Loretto, the Border Patrol also created a permanent presence by grading Plaintiffs' roads, constructing the hootch, and positioning portable lights on the property.  See Hendler, 952 F.2d at 1377; see also Loretto, 458 U.S. at 441.  The Court finds that this activity sufficiently inhibited Plaintiffs' ability to exclude others from their property and interfered with their use and enjoyment of their land such that the alleged taking accrued no later than 1999.  See John R. Sand, 457 F.3d at 1358; see also Aaron, 311 F.2d at 800; Klein, 152 Ct. Cl. at 223-24.

Plaintiffs' argument that the taking did not accrue until the aftermath of the September 11, 2001 terrorist attacks lacks any evidence to support it.  Plaintiffs allege that prior to September 11, 2001, Border Patrol activity on the subject property was insignificant because Plaintiffs rarely saw agents on their property, and agents rarely chased or followed them. Pl.'s Brief at 29.  Plaintiffs assert that the Border Patrol's presence changed dramatically after September 11, 2001 when Congress expanded the agency's role to include terrorist interdiction, and the Government completed the segment of the secondary fence adjacent to Plaintiffs' property.  Id. 29-30.  Only then, according to Plaintiffs, did the Border Patrol "effectively 'declare' to Plaintiffs that it, too, owned an interest in the property in the form of an access easement . . . ."  Id. 30.  The Border Patrol's mission may have changed after September 11, 2001, but there is no evidence that the agency's new duties impacted its operations on the subject property.  By the end of 1999, the Border Patrol had already reduced its presence on Plaintiffs' land when the San Diego Sector began detailing agents temporarily to other Sectors experiencing higher alien traffic.  E.g., Fisher, Tr. 1175-76.  As

a result of these temporary details, the Border Patrol no longer had sufficient manpower to staff all stationary positions on the subject property and only deployed agents to positions on Tin Can Hill (parcel 3) and Well Draw (parcel 3).  E.g., Beales, Tr. 1828.  Following September 11, 2001, the Border Patrol documented a decrease in presence on the parcels because the San Diego Sector began detailing agents temporarily to New York City, and some agents left the Border Patrol to join the Air Marshal's Service.  Weatherred, Tr. 1475-76.  At that point, the number of agents on Brown Field Station's ATV unit available to patrol the subject property declined to six per shift.  Beales, Tr. 1829-30.

Plaintiffs offered anecdotal testimony from Mr. Wick, Mr. De La Fuente, and Mr. Andreu that they noticed an increase in the number of Border Patrol agents on the property and that agents stopped or chased them more frequently after September 11, 2001.  These witnesses also testified that the completion of the portion of the secondary fence adjacent to Plaintiffs' land in 2001 created a funneling effect whereby illegal aliens increasingly sought to enter the United States through the subject property.  They claim that the Border Patrol responded to this influx of aliens on Plaintiffs' property by expanding their presence "to the point that it [was] virtually around-the-clock, on a year-round basis."  Pl.'s Brief at 33.  Plaintiffs point to testimony by Border Patrol agents assigned to Brown Field Station after September 11, 2001 who admitted to taking up stationary positions on the subject property, patrolling on foot and by ATV, and grading roads without Plaintiffs' consent.  However, the Border Patrol's manpower data refutes the witnesses' subjective belief that the agency had increased the number of agents deployed to the Plaintiffs' land after September 11, 2001.  The agency actually deployed more agents on average to the East Mesa, including the subject property, during the 1996 to 1999 time frame than from 2000 to 2006.  DX 800(32).  Furthermore, the type of activity Plaintiffs describe – agents stationing themselves in fixed positions, patrolling round the clock on foot and by vehicle, and grading roads – is entirely consistent with the Border Patrol's operations on the subject property in the mid-to-late 1990s, albeit on a lesser scale.[4]  Plaintiffs have not challenged Defendant's evidence that the Border Patrol began engaging in these activities in the mid-to-late 1990s, and therefore, they have failed to prove that their takings claims accrued later in time.

Finally, Plaintiffs claim that the Border Patrol's previous leases on the subject property constituted a consensual occupancy that did not start the running of the statute of limitations.  The Court disagrees.  "Use by consent cannot constitute a taking."  Econ. Dev. & Indus. Corp. of Boston v. United States, 13 Cl. Ct. 590, 597 (1987) (citations omitted).

_____

[4] As part of their argument that the Border Patrol increased its presence on the subject property after September 11, 2001, Plaintiffs allege that the Border Patrol removed barricades and gates that Plaintiffs erected on their property and interfered with construction and efforts to lease their land.  However, these alleged activities occurred in 2006, after this litigation commenced, and therefore are irrelevant to determining when the takings claims accrued.

The two leases on which Plaintiffs rely consist of the Border Patrol's lease of a twenty-foot strip of property along parcels 1 and 3 between 1984 and 1988 and the twenty-foot-wide easement to conduct surveillance and law enforcement on the property 24 hours per day between 1992 and 2002.  De La Fuente, Tr. 253-54; PX 118(a)-(d); DX 521, DHS23339. The first was executed in the mid-to-late 1980s before the Border Patrol's activity arose to the level of a taking and therefore does not impact the running of the statute of limitations. The second granted the Border Patrol consensual use of a twenty-foot-wide swath of land and can hardly be construed to extend to the more than 1,200 acres of land subject to this litigation.  Accordingly, the Court rejects Plaintiffs' consensual occupancy argument as a means of delaying the running of the statute of limitations.

### 2. Plaintiffs Were Aware of the Border Patrol's Activity Since the 1980s.

Plaintiffs were aware or should have been aware of the Border Patrol's activities on their property since the mid-1980s.  Roque De La Fuente testified that he was aware of the Border Patrol's presence on his property as early as 1985.  De La Fuente, Tr. 253-54. Property manager David Wick admitted his knowledge that Border Patrol agents were present on some of the parcels in the 1990s.  Wick, Tr. 525-26.  Property manager Jose Andreu also testified that he had seen agents on the subject property prior to 2000.  Andreu, Tr. 336-37.  Furthermore, both Mr. Wick and Mr. Andreu admitted that they had been stopped by the Border Patrol when visiting the property in the 1990s.  Wick, Tr. 739-40; Andreu, Tr. 337.  By the mid-to-late 1990s, the Border Patrol's presence became highly visible as agents assumed fixed positions on the subject property to deter illegal alien activity.  Hance, Tr. 1235; Beales, Tr. 1824.  This open and notorious use of the land put Plaintiffs on inquiry notice of the Border Patrol's activity and precludes them from arguing lack of knowledge.  See, e.g., Ingrum, 560 F.3d at 1317.

Beyond these admissions, the easements Plaintiffs executed with the Border Patrol establish their knowledge of the agency's presence on their property.  In 1984, Mr. De La Fuente negotiated a lease with the Border Patrol on behalf of Plaintiff Rancho Vista Del Mar for use of a twenty-foot strip of property along parcels 1 and 3.  De La Fuente, Tr. 253-54; PX 118(a)-(d).  The parties renewed the lease annually from 1985 to 1988.  De La Fuente, Tr. 255, 320; PX 118(a)-(d).  In 1990, the Border Patrol acquired from Mr. De La Fuente a legal right of access to travel from Alta Road to the Otay Truck Trail on a fifty-foot easement.  DX 516, 518, 520.  Finally, between 1992 and 2002, Plaintiff Rancho Vista Del Mar granted the Border Patrol a twenty-foot-wide easement along the Mexican border for the purpose of conducting "[s]urveillance and law enforcement . . . at all hours of day or night, seven days per week, by government vehicle, horseback, or on foot" and to construct the primary fence.  DX 521, DHS23339.  Plaintiffs' own admissions, along with their voluntary conveyance of various easements to the Border Patrol to use their property,

demonstrate Plaintiffs' awareness of the Border Patrol's presence on the subject parcels dating back to the mid-1980s.  See, e.g., John R. Sand, 457 F.3d at 1356 (citations omitted).

      C.  <u>Defendant is Liable for the Physical Taking of an Easement for the Sole Purpose of Installing and Operating Sensors on Parcels 1, 3, 4, 5, and 10.</u>

Defendant has stipulated to partial liability for the physical taking of an easement across parcels 1, 3, 4, 5, and 10 due to the installation and use of the seismic sensors, which the Border Patrol admits having located on these parcels between 1999 and 2005.  Plaintiffs argue that Defendant's stipulation to partial liability for use of the sensors "necessarily includes the Border Patrol activity that is triggered by the sensors" because the sensors detect motion 30 feet in each direction, and the Border Patrol must traverse all eleven parcels to respond to them.  Pl.'s Brief 23-24.  Plaintiffs therefore urge the Court to "conclude that a large proportion of Border Patrol occupancy and use of all eleven of Plaintiffs' parcels is directly attributable to the operation of the sensors, which initiate 85 percent of the apprehensions on those eleven parcels."  Id. 24.  However, the Court declines to expand Defendant's stipulation of partial liability to an admission of a physical taking of the entire subject property.  While seismic sensors accounted for 85 percent of apprehensions throughout the San Diego Sector, the Border Patrol testified that agents relied primarily on night scopes to detect illegal aliens on the subject property.  Compare Weatherred, Tr. 1505-06 with Weatherred, Tr. 1509-10.  The Border Patrol's response to triggered sensors on fewer than half of the parcels does not amount to a "permanent and exclusive occupation" of the subject property at large.  See Boise Cascade Corp., 296 F.3d at 1353.  Accordingly, Plaintiffs are entitled to a judgment of liability for the seismic sensor easement and no more.

The fact that at least some of the sensors may have been installed more than six years prior to Plaintiffs' filing of the lawsuits raises a potential statute of limitations question, but Plaintiffs have asserted that they had no knowledge of the sensors prior to this litigation.  The record contains an August 24, 1984 letter from the Border Patrol to the County of San Diego referencing the use of "highly sophisticated electronic sensors."  PX 2.  However, there is no evidence that Plaintiffs received this letter, and even if they had, there is no indication that the Border Patrol was referring to the use of electronic sensors on Plaintiffs' property.  The Court will not give notice effect to a letter 15 years prior to the 1999 installation of sensors on Plaintiffs' property, where there is no showing that Plaintiffs received the letter.  Since the sensors are buried below the ground except for a one-foot antenna, the Court will not place Plaintiffs on notice of the sensors because the Border Patrol's use of the sensors was not "open and notorious" on Plaintiffs' property.  Ingrum, 560 F.3d at 1317.  Absent notice from the Border Patrol, Plaintiffs' claims of an easement for the seismic sensors are not barred by the statute of limitations.

<u>Conclusion</u>

Based on the foregoing, the Court lacks subject matter jurisdiction over Plaintiffs' claims because they are barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501.  However, Defendant is liable for the physical taking of an easement over parcels 1, 3, 4, 5, and 10 due to the installation and use of the seismic sensors.  Counsel for the parties shall submit a joint status report to the Court on or before June 4, 2009 providing a proposed procedure and schedule for determining damages associated with the sensor easement.

IT IS SO ORDERED.

<u>s/ Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge