# In the United States Court of Federal Claims

No. 06-167L (and consolidated cases)

(Filed: May 30, 2013)

*************************************\*

| | |
|---|---|
| \* | |
| OTAY MESA PROPERTY, L.P., et al., | \* |
| | \* |
| | \* Fifth Amendment Taking; U.S. Border |
| Plaintiffs, | \* Patrol's Use of Seismic Intrusion |
| | \* Sensors on Plaintiffs' Property; Risk to |
| v. | \* Plaintiffs that Property Could Not Be |
| | \* Used for Mitigation Purposes Under |
| THE UNITED STATES, | \* California Land Use Law; Fair and |
| | \* Reasonable Determination of Damages. |
| Defendant. | \* |
| | \* |

*************************************\*

*Roger J. Marzulla*, with whom was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Lary C. Larson*, with whom were *Ignacia S. Moreno*, Assistant Attorney General, and *Joshua A. Doan*, Trial Attorney, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., *Michael Felts*, Senior Attorney, United States Customs and Border Protection, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case is before the Court on remand from the United States Court of Appeals for the Federal Circuit to determine the proper amount of damages due Plaintiffs Otay Mesa Property, LP, Rancho Vista Del Mar, Otay International, LLC, OMC Property, LLC, D&D Landholdings, LP, and International Industrial Park, Inc.  See Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1360 (Fed. Cir. 2012).  The factual background and history of this case are found in the Court's previous opinions.  See Otay Mesa Prop., L.P. v. United States, 93 Fed. Cl. 476, 479-84 (2010) ("Damages Decision"); Otay Mesa Prop., L.P. v. United States, 86 Fed. Cl. 774, 775-85 (2009) ("Liability Decision").  The Court will provide a brief overview of the facts relevant to the issues currently on remand.

Plaintiffs own eleven contiguous parcels of largely undeveloped land in San Diego County, California near the United States' border with Mexico. The land is subject to an easement taken by the United States Border Patrol to allow for the placement of seismic intrusion sensors on the property. In proceedings leading up to the trial in the liability phase, Government counsel drafted and filed this easement on October 16, 2008, conceding liability for a Fifth Amendment taking. The easement is styled as a "stipulation," but Plaintiffs played no role in drafting or assenting to the terms of this document. Plaintiffs did not receive any compensation in return for the Government's taking of the easement.

According to the October 16, 2008 document, the Government holds "[a] perpetual and assignable easement to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location." PX 1 at ¶ 7. The document lists fourteen seismic intrusion sensors at various underground locations on parcels 1, 3, 4, 5, and 10 of Plaintiffs' property, and states the month of installation for each sensor. Id. at ¶ 5; see Liability Decision, 86 Fed. Cl. at 777. The Government states that in placing these sensors on the five parcels of land, "it has taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed." PX 1 at ¶ 6. The Government also states that the easement "will continue until the sensor is no longer needed or the property is developed[,]" in which case "the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property." Id. at ¶ 7. Regarding termination, the document states that "upon removal of a sensor, the portion of the easement relating to that sensor shall terminate." Id. The sensors are approximately one cubic foot in size, and upon being buried in the ground, a one-foot long antenna extends above the ground for each sensor. Id. at ¶ 3.

Based upon the Government's concession, this Court held that the Government was liable for the physical taking of an easement over the five parcels for the purpose of installing and operating the sensors. Liability Decision, 86 Fed. Cl. at 790. In the subsequent decision on damages, the Court held that the Border Patrol had taken a temporary, non-exclusive blanket easement, entitling Plaintiffs to monthly compensation of $41.50 per acre based on a fair market rental valuation method. Damages Decision, 93 Fed. Cl. at 479-80. The Court awarded a total of $3,043,051, plus interest, for the number of acres covered and the duration of the easement for each sensor. Id. at 488-90.

On appeal, the Federal Circuit held that the blanket easement encumbering Plaintiffs' property was a permanent rather than a temporary taking, and remanded the case to this Court for a redetermination of damages. Otay Mesa, 670 F.3d at 1369. The Federal Circuit characterized the taking as "a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa." Id. at 1368. This

Court conducted a remand trial on damages in Washington, D.C. on December 11-12, 2012.  Thereafter, the parties submitted post-trial briefs on February 21, 2013 and reply briefs on March 15, 2013.  The Court heard closing arguments on May 1, 2013.

After three trials, two decisions from this Court, and a decision from the Federal Circuit, the parties' positions on damages remain widely divergent.  Currently, Plaintiffs assert that they are entitled to approximately $5,100,000 in just compensation, while the Government argues that Plaintiffs are entitled to no more than nominal damages. Plaintiffs claim that the easement reduces the value of their developable land, and prevents the environmentally sensitive land within the parcels from being used for valuable mitigation purposes under California land use law.[1]

The Court has conducted a thorough review of the entire record in this case.  For the 897 acres of land at issue on parcels 1, 3, 4, 5, and 10, approximately 278 acres are suitable for development, and 619 acres can be used for mitigation.  As will be explained, the Court finds that it must treat Plaintiffs' developable land differently from the mitigation land.  The Border Patrol's sensor easement would have no material effect on the developable land, because Plaintiffs may have the sensor removed upon 30 days written notice that the county has approved development.  For the mitigation land, however, the Court is faced with conflicting evidence on the issue of whether the sensor easement would constitute an impediment to a contemplated mitigation use.  Plaintiffs' witnesses state that the easement would preclude use of the property for mitigation, and have ascribed a 40 percent reduction in fair market value for this land.  Conversely, Defendant's witnesses state that the sensor easement would pose no obstacle to the use of the property for mitigation purposes.

In weighing this conflicting evidence, the Court finds Defendant's position that the environmentally sensitive land is still suitable for mitigation to be slightly more credible. However, there is a risk to Plaintiffs that the property might not be acceptable to California authorities for mitigation because of the Border Patrol's sensor easement. Whether or not the property is ultimately deemed unsuitable, Plaintiffs were involuntarily required to assume a risk that they did not have prior to the sensor easement.  The task before the Court is to place a value on this risk.  A fair and reasonable outcome is to award Plaintiffs a five percent reduction in the value of their mitigation land because of the potential denial of a mitigation request.  Using Plaintiffs' assessment of fair market value of $9,110,400 for the 619 acres of mitigation land, a five percent reduction results in an award of $455,520 in damages to Plaintiffs.

---

[1] In general, a real estate developer in California must acquire and set aside "mitigation land" equal to the amount of land used for development.  Thus, undeveloped "mitigation land" has a significant value to anyone wanting to gain approval for a real estate development project, as further discussed in the next section.

The Court is mindful of the Federal Circuit's observation that "[i]t does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement." Otay Mesa, 670 F.3d at 1368. However, the Federal Circuit also instructed this Court to award damages for precisely what was taken by the Government: a taking defined as "a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa," the use of which cannot "affect the functionality of the property." Id. In light of this Court's discretion "to fashion an appropriate measure of compensation," id. at 1369, the Court determines that a five percent reduction of the mitigation land's fair market value is an appropriate measure of the risk that the sensor easement causes to Plaintiffs. A full analysis of the Court's reasoning is provided below.

I.      Conservation Programs and Mitigation Land

The properties at issue are all located in the Otay Mesa area of San Diego County, California. "Otay Mesa is 'sandwiched' between two fast-growing areas [Tijuana and Chula Vista] . . . [and] [t]he growth in these two areas creates a demand pressure for land that spills over into Otay Mesa." PX 6 at 8. Much of Otay Mesa, however, consists of environmentally sensitive land, which both the federal and local governments seek to preserve, while still allowing reasonable economic growth. See id. at 58-61. The United States Fish and Wildlife Service ("FWS") has determined that many endangered and threatened species and their respective critical habitats are found on portions of the subject properties. Damages Decision, 93 Fed. Cl. at 483.

Conservation programs such as the Multiple Species Conservation Program ("MSCP") and the Multiple Habitat Conservation Program identify areas of high biological value in which preservation is encouraged. PX 6 at 59. In efforts "to protect and preserve environmentally sensitive lands," regulations and ordinances dictate that development is permissible provided that the landowner mitigates any environmental impacts by preserving biologically equivalent land, called "mitigation land." Pls.' Post-Trial Br. 6, 30-32; see also Def.'s Post-Trial Br. 46.

"Mitigation land" is land that qualifies under federal, state, or local regulations as land that can be used to offset development of other environmentally sensitive land. Pls.' Post-Trial Br. 29. Generally, mitigation requires the substitution of one acre of environmentally sensitive land for another through the preservation of biologically equivalent land. Id. at 30, 32; see also Def.'s Post-Trial Br. 43. Depending on the affected habitats and species, however, the ratio of impacted acres to mitigation acres may change. PX 5 at OM_006200. Resource agencies must approve management plans for the mitigation land, which are reviewed to ensure the perpetual preservation of critical habitat and endangered species. Id. at OM_006220. A typical application for a proposed mitigation bank includes a title report "indicating any easements or other encumbrances" on the proposed property, as well as an explanation as to how any encumbrance may

affect viability for mitigation.  Id. at OM_006231 (Multi-Agency Checklist, Prospectus for Mitigation Banks).[2]  Once a plan is approved, the United States Fish and Wildlife Service, working in concert with the California Department of Fish and Game, "essentially issue 'take authorizations,'" which authorize harm to an individual species or habitat in exchange for conserving the species or habitat proportionally on other acreage. PX 6 at 60.

Given that developers may find it difficult to locate appropriate mitigation land and provide for its long-term management, FWS incentivizes the creation and management of conservation banks, which allow developers to purchase off-site compensatory habitat, known as "off-site mitigation."  PX 5 at OM_006188.  As explained by the FWS, "Landowners can profit from selling habitat or species credits to parties who need to compensate for adverse impacts to these species."  Id.  The land within an established conservation bank is actively managed and protected, thus the purchase of credits from such a bank affords developers "regulatory certainty," as well as helping them to save time and money in the event of required mitigation.  Id.

II.     2009 Damages Trial

During the 2009 damages trial, the parties presented fourteen witnesses in support of their respective positions regarding the easement's impact on the property.  In the remand trial, the parties and their experts drew upon the record established in the 2009 trial.  The Court will discuss here the relevant portions of the 2009 record that the experts relied upon in the present damages trial.

In preparing his report, Plaintiffs' expert, Mr. Randy Tagg, stated that he primarily relied on the testimony and reports of the following witnesses presented in the 2009 trial: Sean Dyer, a land entitlement and development professional; Cynthia Eldred, a San Diego land use attorney; Jim Carter, a mitigation land broker; Susan Wynn, of the U.S. Fish and Wildlife Service; and David Lawhead, of the California Department of Fish & Game.  PX 6 at 103-05; 2012 Tr. 41-42.  In addition to his reliance on these witnesses, the Government's expert, Mr. Stephen Roach, stated that he also relied upon the testimony of Michael McCollum, a private sector land consultant on environmental issues and mitigation banking, and Richard Shick, a project manager for the County of San Diego Department of Public Works.  DX 44 at 42-43; 2012 Tr. 217.  Mr. Dyer, Ms. Eldred, and Mr. Carter were all experts called by Plaintiffs during the 2009 trial, whereas

---

[2] "Note: any liens and easements on the proposed Bank Property that may affect a mitigation bank's viability will need to be resolved before a mitigation bank can be approved.  Provide a property assessment that summarizes and explains each recorded or unrecorded lien or encumbrance on, or interest in, the proposed Bank Property, including, without limitation, each exception listed in the Preliminary Title Report and describing the manner in which each encumbrance may affect the mitigation bank's operation or habitat services."  PX 5 at OM_006231.

Ms. Wynn, Mr. Lawhead, Mr. McCollum, and Mr. Shick were called by the Government. The Court will summarize the opinions of these witnesses below.

    a.  Plaintiffs' Witnesses

The Court accepted Mr. Dyer as "an expert in the purchase and development of land in San Diego County." 2009 Tr. 141. Mr. Dyer testified that he "wouldn't touch this property with a 10 foot pole," as the easement was "one of the most devastating easements [he'd] ever heard of." Id. at 150, 160. Mr. Dyer's opinion was based on his assumption that the easement allowed for an unlimited number of sensors to be placed on the property: "Well, first of all, let me point out that it doesn't, to me, limit the number of sensors that can go on the property, and there's almost 43 million square feet of property here, so you could put a lot of sensors out there if you wanted to." Id. at 153. Mr. Dyer also testified that the easement "makes it very difficult to mitigate for endangered species." Id. at 150.

The Court also accepted Ms. Eldred, a land use and zoning attorney in San Diego County, as an expert. Id. at 71. She testified that "the existence of the easement itself decreases the value of the land for mitigation purposes not only because of the disturbance that it involves, but because it increases the requirements for habitat management which will then decrease the land value." Id. at 91. In her experience, "agencies have deducted from the value of property as mitigation land, if they will approve it at all, because of the existence of the ability of agencies, public or private entities, to go on the property pursuant to easements." Id. at 98.

The Court accepted Mr. Carter, a mitigation land broker in California, as an expert in mitigation. Id. at 182. He testified that the October 16, 2008 stipulation, as he reads it, "would have a pretty severe effect on using this property as mitigation," and that he was "primarily concerned with the sensitive habitats." Id. at 193, 195. Mr. Carter observed that, in his opinion, "[the] Border Patrol's normal duties, other than responding to sensor hits, . . . makes it very difficult to manage these properties for mitigation purposes." Id. at 217.

    b.  Defendant's Witnesses

For the Defendant, the Court accepted Ms. Wynn as an expert, to which Plaintiffs stipulated. 2009 Tr. 861. Ms. Wynn is a biologist at the U.S. Fish and Wildlife Service, where she primarily focuses on research and protection of biological resources in San Diego County. Id. at 857-60. In particular, she actively works on implementing and amending the Multiple Species Conservation Plan, which determines which areas and species need to be conserved and mitigated, and governs the issuance of permits and monitoring of land management. Id. at 858-67. Ms. Wynn testified that the FWS, through its implementation of the MSCP, views all of the Plaintiffs' property as valuable

property for mitigation purposes.  Id. at 883-84.  Ms. Wynn acknowledged that FWS is aware of the long-present Border Patrol activities that disrupt the environmentally sensitive land, but nonetheless, "[t]here [are] a fair number of species that only occur in this vicinity[,]" id. at 884, "this is where the habitat is, this is where the species are, and there's not other options," id. at 885-86.  Ms. Wynn testified to her knowledge that the Border Patrol had placed seismic sensors on the property, but based on her observations in the field, she "believe[s] that the impacts are negligible, that they're not measurable." Id. at 887.  In her opinion, the rights granted under the easement – the right to place, access, and relocate fourteen underground sensors – would not have any effect on FWS accepting the properties for mitigation purposes.  Id. at 890-91.

The Government also presented the expert report and testimony of David Lawhead, a Staff Environmental Scientist at the California Department of Fish and Game, where, among other duties, he reviews proposed mitigation banking agreements and issues permits.  Id. at 535-36.  Based on his review of the relevant documents and his site visit, Mr. Lawhead concluded that the direct placement of the sensors and the occasional maintenance would have a "negligible effect" on biological resources, and would not cause a deduction of any mitigation credits.  Id. at 553, 560 ("The impact is much too small to be concerned.  Our assessment of its mitigation value would be a summation of all the impacts that are occurring there just looking at the current existing state of the property as a result of all the activities that have been there historically and up to the present.").  Mr. Lawhead did note, however, that the California Department of Fish and Game may want to analyze what rights the federal government has under the easement, and would perhaps seek a supplemental agreement prior to approving the land for mitigation.  Id. at 574.

Mr. McCollum, a biologist and former Chief Deputy Director of the California Department of Fish and Game, also testified on behalf of the Government.  Id. at 904-05.  Mr. McCollum was accepted and testified as an expert in the field of the purchase and sale of environmental mitigation lands.  Id. at 902.  Mr. McCollum is currently employed as a land consultant involved in setting up and selling habitat mitigation.  Id. at 907.  Mr. McCollum opined that the easement and activities conducted under it would have a negligible effect on the environmental resources of the property as well as on an agency's decision to use the property for mitigation.  Id. at 908-10.

Mr. Shick, a project manager for the County of San Diego Department of Public Works, testified as an expert in the grading permit process.  Id. at 489.  Within this department, Mr. Shick "oversee[s] a team of land surveyors and engineers in the processing of entitlement and final engineering private development projects within the County of San Diego, the unincorporated area."  Id. at 486.  He reviews and approves plans and is responsible for issuing grading permits in the Otay Mesa area.  Id. at 487.  In Mr. Shick's opinion, the easement would not prevent the department from issuing a grading permit, id. at 495, although the stipulation "may result in an advisory note on the

plans advising the applicant that they would have to notify the United States within 30 days upon issuance of the permit," id. at 494.

III.    2012 Damages Trial

At the December 2012 damages trial, the parties each presented only one witness, the testimony of their respective expert.  Each expert provided an appraisal report based on the Federal Circuit's determination that the easement was permanent, as opposed to temporary.  Plaintiffs' expert, Mr. Tagg, concluded that the easement reduced the value of the developable acres by ten percent, and the mitigation acres by 40 percent.  The Government's expert, Mr. Roach, concluded that the easement has no measurable impact on the value of Plaintiffs' land.  Mr. Tagg and Mr. Roach both provided expert reports and testified in previous stages of the litigation, the liability trial and the damages trial, respectively.  Where relevant, portions of these previous reports will be addressed in this discussion.

a.  Plaintiffs' Expert – Randy A. Tagg

Plaintiffs' expert, Mr. Tagg, valued the property through "the standard before-and-after approach recommended for valuing permanent easements by the Government-published Uniform Appraisal Standards for Federal Land Acquisition."  Pls.' Post-Trial Br. 12.  In valuing real property, the key consideration is the property's "highest and best use," defined as "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future."  PX 6 at 53 (citing Uniform Appraisal Standards for Federal Land Acquisition 34 (Appraisal Institute ed., 2000)); 2012 Tr. 35.  Accordingly, Mr. Tagg first determined the highest and best use of each parcel in the before (pre-easement) condition, based upon factors such as "size, shape, topography, biology, street improvements, title report, and zoning."  Pls.' Post-Trial Br. 12-13.  Of the 897 acres covered under the blanket easement, Mr. Tagg concluded that mitigation was the highest and best use of 619 acres, and industrial development was the highest and best use of 278 acres.  Id. at 13; PX 6 at 113.

After assessing the highest and best use, Mr. Tagg used a series of comparable sales to determine the fee value, or market value, of each parcel in the before condition.  Pls.' Post-Trial Br. 14.  Mr. Tagg identified and used a total of eleven comparable sales for his valuation process.  Id. at 14, 15; PX 6 at 87.  Based upon this comparable sales analysis, Mr. Tagg concluded that the market value of the subject property in the before condition was $23,658,200.  Pls.' Post-Trial Br. 16; PX 6 at 99.  Mr. Tagg then proceeded to determine the highest and best use of the land in the after condition.  The after condition, according to Mr. Tagg's interpretation, was land burdened by a permanent, blanket easement which:

> [A]llows the use and occupancy of the entire 897-acre Subject property by the government.  The number of sensors and their locations, along with ingress/egress routes, is neither specified nor limited.  Any number of seismic sensors can be placed anywhere on the five (5) Subject parcels and responders have the right to ingress/egress by any route to any location on the parcels.

PX 6 at 101.  As discussed below, Mr. Tagg determined that the sensor easement impacted the value of developable and mitigation acres differently.

### i.  Tagg's View of Impact on Developable Land

In assessing the impact of the sensor easement on the value of the developable land, Mr. Tagg relied on the results of his market survey and the testimony of Mr. Dyer.  PX 6 at 104, 111.  For his market survey, Mr. Tagg contacted seven people, only four of whom responded and participated.  2012 Tr. 158.  The four who did respond were industrial developers in Otay Mesa.  Id. at 86.  The interviews with these four persons consisted of telephone conversations in which Mr. Tagg paraphrased the easement and inquired whether, and to what extent, the market value of the developable property would be reduced by such an easement.  Id. at 86, 158.

Two of these individuals would not provide an exact value or percentage, but stated that they would pay less for the property because of the easement.  Id. at 90.  As a result, Mr. Tagg established a bottom range for diminution of five percent, based on his experience as an appraiser that "if a value characteristic is noticeable it has to be at least 5 percent to be measurable."  Id.  The other two individuals Mr. Tagg spoke with believed that the upper limit of the diminution value associated with this easement would be "close to" ten percent.  Id. at 91.  Out of this five to ten percent range, Mr. Tagg set the diminution in value at ten percent, reflecting the unquantifiable "self-mitigation problem."  Id.[3]  Accordingly, Mr. Tagg deducted ten percent from the value of the developable land within each parcel.  PX 6 at 112.  Mr. Tagg exchanged no written correspondence with these developers, and his work files do not contain any notes of his conversations with them.  2012 Tr. 158.

### ii.  Tagg's View of Impact on Environmentally Sensitive Land

Regarding the environmentally sensitive land within the subject parcels, Mr. Tagg concluded that the easement changed the highest and best use of the land from mitigation

---

[3] Mr. Tagg explained this "self-mitigation problem" as follows:  "When the mitigation acreage is no longer usable as mitigation and the property owner needs to go out into the market and buy it, that's a huge market risk.  So that is an issue also.  So I would conclude it at the upper range or 10 percent for that reason."  2012 Tr. 91-92.

to conservation, resulting in a diminution in value of 40 percent.  PX 6 at 111-113. According to Mr. Tagg, "conservation land is property that is voluntarily preserved in its natural, scenic, agricultural, historical, forested, or open-space condition for reasons other than to satisfy a mitigation requirement."  Pls.' Post-Trial Br. 35.  Mr. Tagg explained that the basic difference between mitigation and conservation is buyer motivation.  PX 6 at 106.  "A purchaser of *mitigation* land buys out of necessity, and some urgency, in order to proceed with a companion development project."  Id.  Because "[t]iming is critical" and mitigation purchasers "must meet certain vegetation/habitat requirements and ratios in order to mitigate specifically-defined environmental damage," the demand for such property drives up the price.  Id. "Conversely, *conservation* transactions are typically opportunistic purchases by non-profit conservation groups," and therefore such a use is less valuable.  Id. Mr. Tagg also explained that "a conservation sale is when the property is no longer usable for mitigation . . . [if] it's not suitable for mitigation, it's not marketable for mitigation, then it's conservation."  2012 Tr. 137.

In arriving at his conclusion that the easement rendered the environmentally sensitive land unsuitable for mitigation, Mr. Tagg relied upon the testimony of expert and government witnesses in earlier proceedings in this case, and emails between Susan Wynn and the landowners.  Pls.' Post-Trial Br. 17-18.  These emails related to the landowners' "efforts to obtain mitigation credit for other environmentally sensitive land in the area."  Id. at 17.  In relevant part, Ms. Wynn explained "we do not generally give credit for mitigation purposes for . . . access roads, utility corridors, etc." and noted that "[i]f the easements allow the easement holder to disturb the site, then those areas would need to be subtracted from the total."  PX 2 at 1-2.[4]  Applying Ms. Wynn's statement to the Border Patrol's right "to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location," PX 1 at ¶ 7, Mr. Tagg concluded that the burdened parcels were no longer suitable for mitigation, Pls.' Post-Trial Br. 18. Instead, the highest and best use of the 619 acres of environmentally sensitive land in the after condition changed from mitigation to conservation.  Id.

To determine the value of these 619 acres in the after condition, Mr. Tagg reviewed comparable sales for both mitigation and conservation use within the county, and conducted a "matched-pair analysis"[5] to assess the value differences between the two uses.  Id. at 19; PX 6 at 107-09.  This matched-pair analysis suggested a market value reduction range of 16 to 46 percent.  Pls.' Post-Trial Br. 19.  Based on the fact that the easement prevented the Plaintiffs from using the environmentally sensitive land for self-

---

[4] These emails did not relate to the subject parcels, and did not discuss the specific sensor easement held by the Border Patrol.  See 2012 Tr. 162.

[5] As described in Mr. Tagg's report, "[a] matched-pair analysis is an appraisal tool, using two or more pairings of otherwise very similar properties, yielding a market-derived *adjustment* for a specific value characteristic."  PX 6 at 107.

mitigation, Mr. Tagg concluded that the easement reduced the market value of the land by 40 percent. Id.

Mr. Tagg bolstered his conclusion by examining three comparable properties where a market participant paid a landowner to keep a parcel of land off the market for a specific time period. Id. at 20; PX 6 at 114-15. Using a mid-range value of $600 per year as the market value and a ten percent capitalization rate, this valuation approach yielded a comparable reduction of 40 percent of the market value of the environmentally sensitive land. Pls.' Post-Trial Br. 20; PX 6 at 114-15.

In Mr. Tagg's 2009 appraisal report, he had concluded that the highest and best use of all 897 acres in the after condition was mitigation. PX 6 at 78. The reason for the change in his 2012 report, he explained, was the Federal Circuit's determination "that the sensor easement is a *permanent/blanket* encumbrance," which is different than the 2009 premise of a temporary easement. Id.; 2012 Tr. 109. Although Mr. Tagg "never looked at the issue" of how the Border Patrol's rights differed under a permanent easement, 2012 Tr. 110, in his professional opinion, a permanent easement has a significantly greater impact on the suitability of the environmentally sensitive land for mitigation, id.

   b.  Defendant's Expert – Stephen Roach

Similar to Mr. Tagg, Defendant's expert Mr. Roach valued the properties through a before and after valuation method based on highest and best use. Mr. Roach agreed with Mr. Tagg that the highest and best uses of the subject parcels in the before condition were either mitigation or industrial development. Def.'s Post-Trial Br. 42; DX 44 at 31-32. Like Mr. Tagg, Mr. Roach then used a sales comparison approach to value each of the subject properties in the before condition, reviewing eleven different comparable sales, and arrived at a total value of $16,271,150 for the properties. DX 44 at 30, 41.

Mr. Roach then analyzed the permanent, blanket easement, which he viewed as permitting the placement of no more than fourteen sensors on the property. DX 44 at 42; 2012 Tr. 395. Upon reviewing expert reports and testimony from representatives of the relevant government agencies, Mr. Roach surmised that "[t]he easement has no impact on future development, nor does it preclude use of the land as mitigation," DX 44 at 42, and accordingly, "the impact of the easement on each subject parcel is de minimis," id. at 44. Unlike Mr. Tagg's conclusion, Mr. Roach found that the easement did not alter the highest and best use of the acres within each parcel. Therefore, under Mr. Roach's analysis, "the easement has no measurable impact on value, and . . . the market value in the after condition is no different than the value of each subject parcel in the before condition." DX 44 at 47.

i.   Roach's View of Impact on Developable Land

Mr. Roach concluded that the sensor easement has no measurable effect on the suitability of the developable land for future development.  His primary basis for this conclusion was the easement language itself, which provides:

> Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property.  Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate.

PX 1 at ¶ 7.  Mr. Roach also relied upon the testimony of Mr. Shick of the County of San Diego Department of Public Works, who stated that, based on his experience, the easement would not result in the Department "not issuing the permit.  I think it would just result in an advisory note on the plan."  Id. at 495.

ii.   Roach's View of Impact on Environmentally Sensitive Land

Similar to his conclusion regarding impact on the developable land, Mr. Roach also concluded that the sensor easement has no measurable impact on the suitability of the environmentally sensitive land for mitigation.  In reaching this conclusion, Mr. Roach relied upon the testimony and reports of Ms. Wynn of the U.S. Fish and Wildlife Service and Mr. Lawhead of the California Department of Fish and Game.  DX 44 at 42.  Given that the approval process for mitigation involves mostly state and federal resource agencies, and representatives from these agencies opined that the easement would have no impact on the acceptance of the land for mitigation, Mr. Roach concluded that the easement impact on the environmentally sensitive land is negligible.  DX 44 at 42, 44.

At trial, Mr. Roach challenged Mr. Tagg's adoption of "conservation" as a highest and best use, explaining that "[c]onservation and preservation are not economic uses.  They have no economic basis behind them.  They have no economic intent behind them."  2012 Tr. 191.  Mr. Roach noted that, although a buyer's intentions may be helpful in conducting an appraisal, such intentions are not determinative:

> I might have a piece of property in downtown San Diego that's a vacant parcel of land that has a highest and best use to build a highrise condo project, but the buyer intends to devote it to surface parking because all they want to do is operate it as a parking lot or they're an investor and they want to hold it.  That doesn't make parking the highest and best use.

Id. at 191-92.  Accordingly, because the environmentally sensitive land may still be used for mitigation purposes, appraisal standards dictate that the highest and best use of that land is mitigation.  DX 44 at 31.  In these circumstances, the easement has no effect on the highest and best use of the subject properties and therefore did not cause any diminution in value.

## DISCUSSION

Cases before this Court on remand are governed by the mandate rule.  Carolina Power & Light Co. v. United States, 98 Fed. Cl. 785, 794 (2011).  "[E]very appellate court judgment vests jurisdiction in the trial court to carry out some further proceedings." Exxon Chem. Patents, Inc. v. Lubrizol Corp., 137 F.3d 1475, 1483 (Fed. Cir. 1998).  As the district court's actions on remand "should not be inconsistent with either the letter or the spirit of the mandate," Laitrim Corp. v. NEC Corp., 115 F.3d 947, 950-51 (Fed. Cir. 1997), mandates should be interpreted by looking at the language of the judgment in combination with the accompanying opinion, Exxon Chem., 137 F.3d at 1483 (citing, inter alia, In re Sanford Fork & Tool Co., 160 U.S. 247, 256 (1895)).

Here, the Federal Circuit's mandate instructs this Court to "determine damages based upon the Border Patrol having taken a permanent blanket easement over Otay Mesa's property, as set forth in the stipulation."  Otay Mesa, 670 F.3d at 1368.  In cases of a permanent taking by easement, damages are often determined through a diminution in value approach.  Id. at 1369.  The Federal Circuit highlighted the fact, however, that this approach is but one appropriate method of valuation, and noted that "on remand the Court of Federal Claims will have discretion in identifying a methodology that fulfills the goal of awarding Otay Mesa just compensation."  Id.  It further instructed that the awarded compensation be for "exactly what [the Federal Circuit] identified as having been taken in this case," namely, "a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa."  670 F.3d at 1368-69.  The Court's undertaking of this task follows.

I.   Just Compensation

Under the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  Accordingly, when government action results in a taking of private property rights, the Constitution requires compensation.  See, e.g., First Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 314-15 (1987).  The landowner bears the burden of proving the value of the land taken for purposes of obtaining just compensation.  See Bd. of Cnty. Supervisors of Prince William Cnty., VA v. United States, 276 F.3d 1359, 1364 (Fed. Cir. 2002).  When less than an entire interest is taken, just compensation is traditionally determined by comparing the difference in market value immediately before and immediately after the taking.  See, e.g., United States v. Miller, 317 U.S. 369, 376 (1943).

Inability to show a diminution in value does not preclude recovery, as damages may be assessed based on the cost of cure, *i.e.* the costs associated with mediating or preventing the injury. Vaizburd v. United States, 384 F.3d 1278, 1285-86 (Fed. Cir. 2004) (remanding for a determination of whether plaintiff presented "sufficient evidence to establish that they reasonably incurred costs to remove the accreted sand"); Ridge Line, Inc. v. United States, 346 F.3d 1346, 1358-59 (Fed. Cir. 2003) (remanding for a determination of damages notwithstanding the lack of a before and after appraisal). The Court of Federal Claims does not have jurisdiction, however, to award nominal damages. Vaizburd, 384 F.3d at 1283 (citing Marion & Rye Valley Ry. Co. v. United States, 270 U.S. 280, 282 (1926)).

II.      The Government's Concession of Liability

In its October 16, 2008 concession of liability, the Government admitted to the installation of fourteen sensors on parcels 1, 3, 4, 5, and 10 of Plaintiffs' property. PX 1 at ¶ 5. Much debate has centered on the parameters of the rights the Government possesses under the easement. The Government maintains that the easement circumscribes the Government's rights to the fourteen stipulated sensors, whereas Plaintiffs argue that "[n]othing in the easement . . . limits the Government to 14 sensors (or any other number)." Pls.' Post-Trial Resp. 47. An additional point of contention is what types of sensors are allowed to be placed on the property. Therefore, as a starting point, the Court will review the stipulation language to determine the extent of the rights held by the Government, given that "[c]ompensation should be based on an assessment of precisely what the government takes from a landowner." Otay Mesa, 670 F.3d at 1368 (citing United States v. Gen. Motors Corp., 323 U.S. 373, 382 (1945)).

In paragraph three of the stipulation, the Government explains the need for and the type of intrusion on Plaintiffs' property:

> As part of its patrol of the border area, the Border Patrol has the need to place seismic intrusion sensors (hereinafter, "sensors") at various underground locations on undeveloped property in the vicinity of the border for the purposes of apprehending aliens attempting illegal entry. These sensors are each approximately one cubic foot in size. Once buried in the ground, an approximately one foot long antenna extends above ground from the sensor.

PX 1 at ¶ 3. The Government then lists fourteen specific sensors and their general locations, and stipulates that "*by virtue of its placement of the 14 sensors specified above on the listed parcels of land, it has taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed.*" Id. at ¶¶ 5-6 (emphasis added). The stipulation goes on to describe the easement more fully, stating that it is:

> A perpetual and assignable easement to locate, construct, operate, maintain and repair or replace *the specified underground seismic intrusion sensors on the specified parcels*, including the right to ingress and egress to each sensor location.

Id. at ¶ 7 (emphasis added).  In the Court's view, the plain language of the easement gives the Government the right "to locate, construct, operate, maintain and repair" *only* those fourteen underground seismic intrusion sensors listed within paragraph five of the stipulation.   This determination does not alter the fact that the Government has a "blanket" easement, as the easement "language suggests that the Border Patrol may place its fourteen sensors anywhere on the five parcels and move them to different locations as desired." Damages Decision, 93 Fed. Cl. at 486, 487 (noting that Plaintiffs were due just compensation for "the Government's taking of an easement to place fourteen sensors"). However, there may not be more than a total of fourteen sensors on the properties at any given time.  This reading is reinforced by the Federal Circuit's explanation that "upon removal of a sensor, the portion of the easement relating to that sensor terminates."  Otay Mesa, 670 F.3d at 1369.  If the easement granted the Government the right to place an unlimited number of sensors on the subject property, there would be no reason to tether the easement rights to the individual sensors already on the parcels.

Plaintiffs make much of email correspondence between counsel for the Government, Lary Larson, and one of the Government's witnesses, David Lawhead of the California Department of Fish and Game.   See, e.g., Pls.' Post-Trial Resp. 48. Prompted by Mr. Lawhead's email inquiry on whether the easement sets a maximum of fourteen sensors, Mr. Larson replied "Basically we admitted liability for 14.  Conceivably Border patrol could add more. . . . Border Patrol can answer any questions you have directly[.]" PX 254.  The Court does not agree with Plaintiffs' implication that this email is an admission establishing the Border Patrol's right to place an unlimited number of sensors on Plaintiffs' property.   In this email, Mr. Larson made no authoritative statements regarding the parameters of the easement, and instead referred Mr. Lawhead to the Border Patrol for any questions he may have.  Moreover, the stipulation itself is a legally binding document, and one which, as demonstrated above, is confined to fourteen sensors.   Mr. Larson's email does not change the meaning of the Government's document.

Plaintiffs postulate that in future years, the Border Patrol may use larger, more intrusive sensors, consistent with the easement's language.  The Government rejects this supposition, pointing to testimony by Border Patrol agents regarding the specific sensors used, as well as their dimensions.  Def.'s Post-Trial Br. 8 (citing 2009 Tr. 809-10 (Herrara)).   As quoted above, the stipulation defines the sensors as being "each approximately one cubic foot in size.  Once buried in the ground, an approximately one

foot long antenna extends above ground from the sensor." PX 1 at ¶ 3. Plaintiffs are correct in pointing out that technology, and subsequently, the sensors themselves, may change throughout the years. Any future sensors, however, cannot exceed the measurements contained in the stipulation; otherwise, the Government will have exceeded the parameters of its easement.

For purposes of determining just compensation, the Government has taken the right to locate, construct, operate, maintain, repair, or replace fourteen seismic sensors, approximately one cubic foot in size with an approximately one foot long antenna, on Plaintiffs' property. To the extent any of the witnesses premise their valuation conclusions on the Border Patrol's ability to place more than fourteen sensors, their evaluation is flawed.

III.     Impact of the Border Patrol's Easement

Based on the evidence presented during the three trials as well as the Federal Circuit's remand instructions, Plaintiffs contend that the sensor easement caused a ten percent diminution in value of the developable land, and a 40 percent diminution in value of the environmentally sensitive land. The Government maintains that any impact on either type of land is negligible or nonexistent. Below, the Court presents its conclusions from the competing arguments and evidence of each side, concerning both categories of land.

a.   No Impact on Developable Land

Plaintiffs contend that the easement reduced the value of the 278 acres of industrial land by ten percent, entitling them to just compensation of $1,454,780. Pls.' Post-Trial Br. 16-17; PX 6 at 115. The support for this assertion is the testimony of Mr. Dyer in the 2009 trial and the results of Mr. Tagg's market survey, both discussed above. Plaintiffs characterize Mr. Tagg's industrial land analysis as "flexible and robust," asserting that "Tagg found ample, reliable evidence supporting his conclusion that the sensor easement caused a 10% reduction in value of the industrial property[.]" Pls.' Post-Trial Resp. 9. The Court, however, finds this analysis less than compelling.

During the 2009 trial, Mr. Dyer spoke generally, and sometimes hyperbolically, regarding the negative implications of the Border Patrol's sensor easement. Mr. Dyer's opinion is based on the assumption that the easement does not limit the number of sensors, a factual predicate this Court has rejected. This mistaken assumption, combined with the pervasive generalities in his testimony, render Mr. Dyer's opinion minimally persuasive. Accordingly, to the extent Mr. Tagg relied upon Mr. Dyer's testimony, his conclusion of a ten percent reduction in value is dubious.

Mr. Tagg's market survey results suffer from similar flaws. To "confirm[] the market perception" of a diminution in value, Mr. Tagg conducted a market survey of Otay Mesa industrial developers. PX 6 at 111. Although Mr. Tagg presented the results of this survey as a "general consensus of damage" of five to ten percent of the fee value, id., a closer review of his survey methodology and results belies this broad characterization. In conducting his survey, Mr. Tagg called seven different people, only four of whom responded. 2012 Tr. 158. With the four participants, Mr. Tagg conducted telephone calls during which he paraphrased the easement and inquired as to what they believed the diminution in land value would be if subjected to such an easement. Id. at 86. Two of the participants refused to estimate any numerical impact. See id. at 90 ("Judd Halenza and John Dillard, I twisted their arm to give me a percentage and they wouldn't. They wouldn't do it."). Nonetheless, based on the conversations with these two participants, Mr. Tagg established a bottom percentage of five percent for the diminution in value. Id. at 90-91. Based on conversations with two other participants, Kaitlin Murphy and John Bragg, Mr. Tagg established an upper limit of ten percent for the diminution in value. Id. at 91. Within this range, Mr. Tagg concluded that the diminution in value of the developable land was ten percent, because the land was not suitable for self-mitigation. Id. at 91-92.

Although there are no records of these conversations, it seems eminently logical that in this "paraphrasing," Mr. Tagg informed the participants of his own interpretation of the easement, to wit, that it allows the Border Patrol to place an unlimited number of sensors on the property. Thus, at the outset, the responses of the survey participants are minimally persuasive, because they were based on an easement that allows for an unlimited number of sensors, as opposed to the limited number of fourteen sensors. See Fed. R. Evid. 702 (expert testimony is reliable and trustworthy when "the testimony is the product of reliable principles and methods . . . and the expert has reliably applied the principles and methods to the facts of the case"); Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 453 (D. N.J. 2009) (oral survey question that omitted information from subject document, thereby changing meaning of document, rendered the survey "unreliable, inconclusive and lacking fit to the facts in issue"). Even disregarding this fundamental alteration of the rights permitted under the easement, in the Court's view, the general responses from four out of seven developers hardly indicates that "[t]he general consensus of damage, related to this easement encumbrance, is 5% to 10% of the fee value," much less provides "ample, reliable evidence." PX 6 at 111; Pls.' Post-Trial Resp. 9. This casual, undocumented, and narrow "survey" fails to evince that Plaintiffs are entitled to $1,454,780 in damages for the industrial development land.

The Court finds the testimony of Mr. Shick, in which he stated that the easement would not impact the development approval process, much more instructive. 2009 Tr. 494-95. Mr. Shick was designated by San Diego County "[a]s the most knowledgeable in the department" on the impact of the easement to receive grading permits for development. Id. at 487, 489; Def.'s Post-Trial Br. 56. Moreover, Mr. Tagg confirmed

Mr. Shick's informed opinion during the damages trial, when he testified that "[u]nder the easement the property owner can still pursue development," and the sensors will not have any effect on the commercial development of developable land.  2009 Tr. 775. Accordingly, the Court finds that Plaintiffs have failed to prove actual damages with respect to a diminution in value of developable land.

   b.   Impact on Mitigation Land

   Plaintiffs claim that the easement rendered the 619 acres of environmentally sensitive land unsuitable for mitigation, resulting in a 40 percent diminution in value.  In support of this theory, Plaintiffs rely on Mr. Tagg's report, which in turn relies upon the testimony of Mr. Dyer, Ms. Eldred, and Mr. Carter.  Mr. Tagg also relied on documents relevant to mitigation and conservation efforts of other parcels within the area, such as emails from Ms. Wynn and existing conservation easements.  Pls.' Post-Trial Br. 10, 17. In contrast, the Government contends that the easement and the Border Patrol's activities under the easement have no measurable effect on the suitability of the environmentally sensitive land for mitigation.  The Government's conclusion is supported by the appraisal report and testimony of Mr. Roach, who in turn relied upon the testimony of, *inter alia*, Ms. Wynn of the Fish and Wildlife Service and Mr. Lawhead of the California Department of Fish and Game.  DX 44 at 12.

   In valuing the easement, Mr. Tagg assumed that "[t]he number of sensors . . . is neither specified nor limited."  PX 6 at 101.  Mr. Dyer was also of the opinion that the Border Patrol could place an unlimited number of sensors under the easement.  2009 Tr. 153; PX 6 at 104.  Because of this assumption, both Mr. Tagg and Mr. Dyer deemed the opinion of Mr. Lawhead, of the California Department of Fish and Game, irrelevant, as he viewed the easement as allowing only fourteen sensors.  Id.; 2009 Tr. 158.

   As the Court has repeatedly instructed, it "only will evaluate the just compensation due Plaintiffs as a result of the Government's taking of an easement to place fourteen sensors anywhere on five parcels of Plaintiffs' property and to access the sensors." Damages Decision, 93 Fed. Cl. at 487; see also Otay Mesa, 670 F.3d at 1369 ("we reiterate that the focus of the damages analysis must always remain on awarding just compensation for what has been taken.").  Mr. Tagg himself pointed out that an easement limited to fourteen sensors "is a very different and far less burdensome property interest." PX 6 at 105.  Therefore, by Mr. Tagg's own admission, he determined the diminution of value based on a significantly different property interest.  It is axiomatic that "[a]n expert opinion is no better than the soundness of the reasons supporting it."  Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (citing cases).

   Plaintiffs further argue that concessions of Ms. Wynn establish that the FWS would not grant mitigation credits for the environmentally sensitive land, thus substantially reducing the value of the property.  In making this argument, Plaintiffs point

to two emails exchanged between Ms. Wynn and the landowners, in which they discussed mitigation credits for parcels not at issue in this case. Pls.' Post-Trial Br. 17-18. In the first of these emails, dated November 7, 2011, Ms. Wynn explained "we do not generally give credit for mitigation purposes for storm water facilities, access roads, utility corridors, etc." PX 2 at 1. This general statement is consistent with the stance of wildlife agencies to reduce mitigation credits for significant intrusions, but not for small intrusions. Damages Decision, 93 Fed. Cl. at 483-84 (citing DX 67 at 4). Although the Border Patrol's easement grants agents ingress and egress to the sensors, it does not permit the Border Patrol to construct "storm water facilities, access roads, utility corridors, etc." PX 2 at 1; see also PX 1 at ¶ 7 (defining the easement as "including the right to ingress and egress to each sensor location . . . . No rights other than those specifically enumerated in this paragraph are being acquired."). In contrast, the easement is "minimally invasive," Otay Mesa, 670 F.3d at 1368, with only negligible effects on the biological resources, 2009 Tr. 887 (Wynn), 2009 Tr. 553 (Lawhead).

In the second of Ms. Wynn's emails, dated January 9, 2012, she discussed the need to review title reports prior to finalizing a conservation maintenance agreement:

> With regards to the title reports, I thought that the county was going to review them and provide us with some feed back on whether the easements would allow the site to be disturbed for roads, access, pipelines etc – review of title reports is a bit out of my area of expertise. If the easements allow the easement holders to disturb the site, then those areas would need to be subtracted from the total[.]

PX 2 at 2. As in the November 7, 2011 email, Ms. Wynn communicated general principles regarding permissible intrusions on mitigation land. Similarly, this email correspondence does not relate to any of the subject parcels, but instead discusses easements entirely different from the sensor easement at issue here. 2012 Tr. 162. Mr. Tagg himself described the present easement as "unique. There is nothing like it. There is no property that I'm aware of encumbered with a similar easement." Id. at 85-86. As Ms. Wynn testified, the subject parcels have habitat that is a high priority for conservation, as some endangered species only occur in the relevant vicinity. 2009 Tr. 884. Thus, given that "[c]onservation banks are a flexible means of meeting a variety of conservation needs of listed species," PX 5 at OM_006192, the unique, minimally invasive nature of the easement, combined with the strong desire on the part of wildlife agencies to preserve the rare habitat on the subject properties, leads this Court to conclude that Ms. Wynn's emails are not applicable to the subject parcels, much less dispositive.

Finally, Plaintiffs point to a conservation easement covering a 92-acre plot of land that several of the landowners granted to San Diego County as mitigation for

development.  PX 3; Pls.' Post-Trial Br. 10.  This document lists prohibited uses of the land, which include "[u]se of off-road vehicles and use of other motorized vehicles except on existing roadways and except as may be required for land management purposes."  PX 3 at 2.  These prohibited uses are consistent with the U.S. Fish and Wildlife's Guidance for the Establishment, Use, and Operation of Conservation Banks, which states that "an active management program – to . . . prevent an area's use by off-road vehicles, illegal garbage dumpers or others; and address myriad other threats – is essential to ensure that the potential conservation value of a particular property is realized and maintained."  PX 5 at OM_006197.  Plaintiffs argue that because the Border Patrol's easement does not specifically preclude the Border Patrol from accessing the sensors with off-road vehicles, the potential biological destruction from these hypothetical access scenarios vitiates the suitability of the property for mitigation.

The Border Patrol had been traversing Plaintiffs' land in such vehicles prior to the imposition of the easement, <u>Liability Decision</u>, 86 Fed. Cl. at 785, a time frame in which Plaintiffs maintain the properties were suitable for mitigation, Pls.' Post-Trial Br. 13-14 (asserting that the property contained 619 acres of mitigation land in the before condition).  Any claims Plaintiffs may have had regarding this Border Patrol presence are time barred.  <u>Liability Decision</u>, 86 Fed. Cl. at 785-86.  Additionally, "[s]ince at least 1982, members of the general public have used the subject property for recreational purposes such as riding off-road vehicles."  <u>Id.</u> at 785 (listing trucks, ATVs, motorcycles, and emergency response vehicles); <u>see also</u> 2012 Tr. 121-22 (Tagg) (admitting that, in the before condition, illegal entrants and off-road recreational vehicles users traversed the subject parcels); 2009 Tr. 216 (Carter) (admitting "there are a lot of other activities on the property in additional to the sensors" that would contribute substantially to the management costs).  The parties have presented no method of determining what percentage, if any, of the land's environmental degradation was caused by sensor activity.  Even if the Court were to accept the premise that the land is no longer suitable for mitigation, Plaintiffs ostensibly ask the Court to disregard the extensive evidence of destructive activity conducted on the land by the Border Patrol and the public, and instead attribute the entirety of this "damage" to the placement of fourteen sensors across 897 acres.

Despite the Court's conclusion that the conflicting evidence tilts in Defendant's favor, the Court is not convinced that a landowner would willingly convey an interest in land to the Government for absolutely no compensation whatsoever, nor that the encumbrance has absolutely no effect on the value of the subject property.  In determining compensation due, a court exercises its reasonable judgment "with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken[.]"  <u>Kimball Laundry Co. v. United States</u>, 338 U.S. 1, 20 (1949).  Here, Plaintiffs undeniably face a risk that their environmentally sensitive property will not be approved for mitigation use.  The Court does not assess this risk to be anywhere near the 40 percent level advocated by Mr. Tagg, but the risk is significant

enough that the Court cannot accept the Government's position of a zero impact either. For Plaintiffs to assume this risk without any compensation for the admitted Fifth Amendment taking would leave Plaintiffs in a worse position than before the taking occurred.  See Olson v. United States, 292 U.S. 246, 255 (1934) ("[Plaintiff] is entitled to be put in as good a position pecuniarily as if his property had not been taken.").  Plaintiffs did not bear this risk in the "before" condition, and certainly it is plausible that the Government's sensor easement might prevent the use of Plaintiffs' property for mitigation purposes.  Even if this outcome never occurs, Plaintiffs' assumption of the risk should be ascribed some value.

In the Court's view, fair and reasonable compensation is to award Plaintiffs five percent of the $9,110,400 fair market value appraisal for the 619 acres of mitigation land.  PX 6 at 99.  Five percent of the fair market value is $455,520, which is the amount of damages awarded to Plaintiffs on remand from the Federal Circuit.  The Court is aware that the parties have debated the validity of the experts' fair market value appraisals, but Mr. Tagg was the only person who set a fair market value for the 619 acres of mitigation land.  Id.  Even if Mr. Tagg's appraisal may lack perfection, it is the best evidence available.  At a damages award of five percent of the appraised amount, any adjustment to Mr. Tagg's fair market value appraisal would have only minimal effect on the final result.

CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs are entitled to just compensation of $455,520, plus interest.  The Court awards Plaintiffs compounded interest from October 16, 2008, the date on which Plaintiffs became aware of the taking through the Government's filing of the stipulation.  Consistent with the previous decision, the interest computation shall be based on the rate set forth in the Contract Disputes Act ("CDA"), 41 U.S.C. § 7109.  Damages Decision, 93 Fed. Cl. at 491.  The Court requests that the parties submit a joint filing on or before June 10, 2013 stating the proper interest amount to be paid under the CDA.  The entry of judgment will be stayed pending the determination of the proper amount of interest to which Plaintiffs are entitled.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge